ROBERT BOSCH CORPORATION, TRANSFEREE OF ROBERT BOSCH CORPORATION, ROBERT BOSCH SALES CORPORATION, ROBERT BOSCH TECHNICAL PRODUCTS CORPORATION, TRANSFERORS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ROBERT BOSCH CORPORATION, TRANSFEREE, ROBERT BOSCH CORPORATION, TRANSFEROR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Robert Bosch Corp. v. Commissioner
Docket Nos. 19153-85; 19555-85
United States Tax Court
T.C. Memo 1989-655; 1989 Tax Ct. Memo LEXIS 657; 58 T.C.M. (CCH) 921; T.C.M. (RIA) 89655; December 12, 1989; As corrected March 27, 1990 John E. McDermott and Michael J. Calvey, for the petitioners. Anne Hintermeister, Nancy Romano, and Virginia L. Draper for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: By notices of deficiency dated March 29, 1985, respondent determined deficiencies in petitioner's Federal income taxes as follows: [1] Taxable Year Ending Deficiencies
December 31, 1979
$ 337,894    December 31, 1980
261,452  December 31, 1981
1,227,927  *658 The primary issue for our decision is whether petitioner's transfers of excess and obsolete inventory to SAJAC Company, Inc., constituted sales entitling petitioner to claim deductions for losses on the disposition of that inventory during the years at issue. If we find that the transactions at issue did not constitute valid sales, then we must further determine whether petitioner is subject to the increase in interest imposed by section 6621(c) upon understatements arising from tax-motivated transactions. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated herein *659 by this reference. A. Petitioner and the Nature of its Business
Petitioner Robert Bosch Corporation (Bosch) is a corporation organized under the laws of the State of Delaware with its principal place of business in Broadview, Illinois. It is engaged in the importation, manufacture and distribution of automotive and other power equipment and of parts therefor. At all relevant times, all of the issued and outstanding shares of petitioner have been held ultimately by Robert Bosch GmbH, a West German corporation. Petitioner, as a result of various corporate reorganizations, is a transferee of the following entities: (a) Robert Bosch Corporation; (b) Robert Bosch Sales Corporation; and (c) Robert Bosch Technical Products Corporation. These entities are now unincorporated divisions of petitioner, though the nature and operation of the business remains the same today as it was during the taxable years in question in this proceeding. Petitioner's operations in the United States are primarily in the areas of automotive products and related equipment. The automotive products activities in the United States are divided into two divisions. One is the original equipment manufacturing *660 division (OEM) whose principal operations are located in Charleston, South Carolina, and the other is the automotive parts aftermarket division (APA), whose principal operations are performed in Broadview, Illinois. The OEM primarily manufactures fuel injection systems and other equipment for sale to manufacturers of automobiles, trucks, and construction machinery. During the years in issue, Harold Verona (Verona) was in charge of customer service, logistics, and planning for the OEM. He was responsible for managing the inventory of the OEM. The APA purchases and then distributes Bosch replacement parts and components to the extensive automobile replacement part market in the United States. The replacement parts are manufactured principally outside the United States -- in Europe, in South America, and in Canada. The APA also purchases and distributes parts and components manufactured by the OEM in Charleston, South Carolina. The APA distributes its parts through approximately 600 warehouse distributors and "key jobbers," that is, distributors who serve smaller areas. It has a distribution contract with each which authorizes the distributors or jobbers to sell and service *661 Bosch parts and obliges them to provide specified levels of service and training in the market which they serve. Petitioner has no ownership or financial interest in any of the distributors or jobbers that it services. During the years in issue, Hubert Buehler (Buehler) was the vice president, finance administration for the APA, with responsibilities for warehousing, distribution, planning, inventory control, personnel, data processing, and the controller functions. During those years, Elliott Nordstrom (Nordstrom) was the purchasing and inventory control manager of the APA; he reported to Buehler. Under the OEM's inventory guidelines, the OEM's inventory was considered excess at 12 months' supply, providing no supervening need could be foreseen. The OEM's concerns were primarily obsolete inventory due to engineering changes or product development. The OEM sold excess and obsolete inventory to scrap or surplus dealers, after first offering it elsewhere in petitioner's organization. The APA has separate guidelines for treatment of excess inventory. Under these guidelines, excess inventory is considered inventory beyond a 24-month supply and for which no need can be foreseen. *662 Some excess and obsolete inventory comes to the APA through its dealer return program, in which dealers may return up to four percent of purchases to the APA, no questions asked, and receive credit at current market prices. Although petitioner had facilities to store its excess inventory, petitioner's policy was to dispose of the excess inventory. B. SAJAC and the Nature of Its Business
The SAJAC Company, Inc. (SAJAC), was incorporated in Wisconsin in 1972. Its principal place of business is in Beaver Dam, Wisconsin. Petitioner owns no interest in SAJAC, directly or indirectly, and SAJAC owns no direct or indirect interest in petitioner. SAJAC has been involved in several functionally different businesses. Most of SAJAC's revenues come as a result of the so-called SAJAC Concept program. Under that program, SAJAC acquires excess and obsolete proprietary inventory -- that is, inventory that is unique to the production of a given company. SAJAC acquires such inventory in bulk at scrap prices, in the hope that some of that inventory will ultimately be needed, and therefore be reacquired, on a part-by-part basis, by the company that sold it to SAJAC. SAJAC also processes, *663 without ever claiming to own, inventory that some companies are compelled to repurchase from dealers under their own so-called "dealer return" programs. In 1975, Jack Lemon (Lemon) and his family and John Cargen (Cargen) and his family each possessed a 50 percent interest in SAJAC. Commencing in 1981, James Finlay International, Inc., acquired first Cargen's and then Lemon's interest. Lemon, Cargen, and Karl Wellensiek (Wellensiek) all served as president of SAJAC for varying periods of time during the taxable years at issue. Wellensiek was the last of the three, and his tenure lasted until shortly before the trial of this case. Wade Fletcher, the vice president of operations and administration, and David Cargen, the executive vice president of SAJAC, had direct day-to-day control over the inventory in the possession of SAJAC and administered the SAJAC Concept. SAJAC stores the inventory that it acquires in 14 warehouses located in four states. SAJAC intermingles the inventory it receives from its customers under the SAJAC Concept in a given warehouse and in a single location within that warehouse in order to obtain maximum high-density storage. SAJAC pays a stipulated *664 price per pound for its bulk acquisitions. SAJAC pays for the transportation and pays the shipping costs. The inventory it receives is shipped to the nearest processing facility. SAJAC avoids acquiring technically complex items, which become obsolete too quickly to make longterm retention economical. It limits its acquisition of items that can be acquired from any of a large number of manufacturers, and it avoids acquiring materials that deteriorate on the shelf, such as rubber and plastics. SAJAC personnel inspect the inventory upon its arrival. SAJAC discards corrosives, liquids, flammable items, and damaged items. Each undamaged part is put into inventory after its manufacturer's identification number is verified. All parts in its inventory are ordered by reference to the manufacturer's identification number. Without this number, the part is useless for the purpose of possible reacquisition. SAJAC adds additional identifying numbers for its own purposes, such as identification of location. All parts accepted under the SAJAC concept are intermingled and stored without reference to the manufacturer of origin. The physical inspection of each part is reflected in appropriate *665 documentation, the most important of which is the "sequenced packing list." The sequenced packing list is utilized as follows: Every shipment to SAJAC is accompanied by a packing list, prepared by the vendor, which lists the items contained in the shipment by part number. SAJAC's computer operators use the packing list to keypunch into SAJAC's computers the part number of each item purchased, together with the date of receipt and the identity of its manufacturer. From this information, SAJAC's computers generate a "sequenced packing list." SAJAC personnel compare the shipment to the sequenced packing list. Parts which are rusty or dirty are cleaned, and the part numbers reapplied. Parts which are susceptible to damage are placed in special containers. The cleaned inventory is then placed in a numbered box. The box, which may contain parts from a number of vendors, is placed on a skid. When the skid is full, it is placed on a shelf for long-term storage. SAJAC's personnel then place the skid on the next consecutive empty space on the shelf, moving from the front to the rear of the warehouse. The skid, shelf, and rack all have identifying numbers. SAJAC employees then record *666 the location of each part on the sequenced packing list. This information is then punched into SAJAC's computer system to provide a means of retrieval of individual items. When a customer wants to acquire parts from SAJAC, SAJAC's computers can determine the precise location of the part so that it can be recovered for shipping to customers. Because the identical part may be located in various places and in varying quantities, SAJAC's computer system is also programmed to choose the warehouse and shelf within the warehouse from which the inventory may most economically be removed. Once it has determined the optimal location for removal of the inventory, the computer generates a "pick ticket." This document provides instruction to SAJAC personnel as to the precise location of the part involved, the quantity at each such location, the pertinent part number, and a brief description of the part. The parts ordered are then taken to SAJAC's inspection department, where, as was the case on initial receipt, the parts are cleaned and painted. SAJAC's crating department then packages the parts for shipment to the customers. During the years at issue, SAJAC purchased inventory from 107 *667 vendors, including some of the country's largest manufacturers of industrial goods. Eleven of these customers, including petitioner, had no written contract. Seven customers had special arrangements with SAJAC, and 88 executed the standard contract as follows: Subject to the terms and conditions below, the Sajac Company, Inc., ("Sajac") agrees to purchase and the undersigned Seller agrees to sell, certain of Seller's inventory. 1. Terms. Sajac may purchase from Seller from time to time, mutually agreed upon inventory, at a price per pound which is equal to the price per pound at the time of shipment for at the market nearest to Seller's warehouse of origin as quoted in the then current Metalworking News Edition of American Metal Market, less cents per pound for freight, F.O.B. Seller's plant or warehouse for full truckloads. Seller shall pay freight for less than full truckloads. Delivery of such inventory by Seller to Sajac shall be at the applicable plant location or warehouse facility of Seller, at which point title to and risk of loss to such inventory shall pass to Sajac. Payment to Seller shall be due in full within thirty (30) days after invoice therefor. 2. Shipping. *668 Sajac will transport or arrange for the transportation of such inventory from Seller's facility. 3. Purchase by Seller. Any inventory sold by Sajac to Seller shall be at a price equal to ninety percent (90%) of Seller's then current standard cost plus any applicable sales or use taxes. F.O.B. Sajac's warehouse. Payment by Seller shall be due in full within thirty (30) days after invoice therefor. 4. Applicable Law. This agreement shall be governed by the laws of the State of Wisconsin. There is no written commitment under any contract executed by SAJAC with its customers under which a customer must sell or scrap inventory with SAJAC, and no written obligation to pay SAJAC storage fees, directly or indirectly, by being compelled to repurchase specific amounts of inventory parts. Nor is there any written obligation on the part of SAJAC to hold inventory in good condition free and clear of liens and encumbrances and no written obligation to return the inventory to the customer or for the customer to pay for the removal cost from SAJAC's warehouses. In the case of its OEM customers, SAJAC "sold" its inventory on a part-by-part basis, with the selling price determined by reference *669 to the customer's unit cost to manufacture or purchase identical inventory. Consistent with the parties' language, we have used the terms "sale," "sell," "sold," etc. in connection with the operation of the SAJAC Concept. That usage is not meant to characterize the legal or tax effect of those operations. In the case of sales to scrap dealers and to parties other than original equipment manufacturers, SAJAC sold the inventory by the part and by weight and at negotiated prices. SAJAC adopted a practice of engaging of warehouse "purges." A warehouse "purge" is the emptying of a warehouse to make room for newer, more profitable inventory. SAJAC establishes a level at which it believes a warehouse should be producing sales dollars on a monthly basis. If the warehouse is not achieving this level, management analyzes the inventory in the building in order to decide what steps to take. SAJAC may decide to keep the inventory in the warehouse in the hopes that sales will improve. Alternatively, SAJAC will "purge" the warehouse, disposing of all or nearly all of the inventory stored in the warehouse by selling it in bulk. The empty warehouse is then refilled with more profitable inventory. *670 SAJAC practiced the "purging" concept during the years at issue, but its most aggressive application came afterwards. SAJAC executives routinely decided to sell and scrap inventory without consulting SAJAC's customers. SAJAC has lost money in dealing with some individual customers. In one instance, a customer made no repurchases of its inventory whatsoever from SAJAC. Commencing in 1984, SAJAC began to make profitability studies as to its original equipment manufacturer customers. Profitability was determined by subtracting from the annual revenue from each customer the total annual cost of inventory acquired from such customer. Expenses were then allocated to each customer in proportion to the weight of inventory on hand and acquired from such customer to the total weight on hand and acquired from other customers. Despite the fact that some customers were unprofitable, SAJAC, as a general practice, did not refuse to accept offers of inventory from any customer. C. Valley Parts and the Nature of Its Business
Valley Parts Supply Company, Inc. ("Valley Parts"), was incorporated in the State of Wisconsin on August 17, 1978. Lemon and his family were 50 percent shareholders *671 of Valley Parts, as were Cargen and his family. On December 31, 1979, Cargen and his family transferred all their shareholdings in Valley Parts to Lemon. On September 30, 1981, Valley Parts sold all its assets, including the use of its corporate name, to a newly organized, wholly owned subsidiary of SAJAC International. The original Valley Parts was liquidated on January 21, 1982. The successor corporation subsequently sold all of its assets and currently has no assets. During the period 1978 through 1981, Valley Parts accumulated losses of $ 101,075 and showed a deficit of this amount on liquidation. Valley Parts was a surplus dealer, and its method of operation was therefore different from SAJAC and the SAJAC Concept. Like SAJAC, it purchased excess inventory from manufacturers. On occasion, Valley Parts would also purchase inventory from SAJAC. Valley Parts' inventory, however, was "faster-moving" -- i.e., faster-selling -- inventory, and was of a higher value than the inventory purchased by SAJAC. Valley Parts purchased its inventory for the purpose of immediate resale. Unlike SAJAC, it did not commit inventory to long-term storage. On the contrary, its existence depended *672 upon its ability to sell its inventory quickly. Furthermore, Valley Parts did not look to manufacturers as its primary customers; its sales were primarily to replacement parts dealers and distributors. Thus, Valley Parts would compete with manufacturers by selling directly to their customers. Valley Parts also sold its goods on the retail market, operating retail outlets not unlike hardware stores, which were open to the public. Valley Parts leased space from SAJAC in three of its warehouses. These rentals were consistent with one of the business operations of SAJAC termed "support services," including "general warehousing." The leasing arrangement ceased in 1981.
D. Bosch's Dealings with SAJAC and Valley Parts
Prior to dealing with SAJAC and Valley Parts, petitioner disposed of excess and obsolete inventory to other scrap and surplus dealers. A scrap dealer is a dealer that basically purchases material for the purpose of melting it to recover its metal content. Scrap dealers generally pay only scrap prices, as listed in a trade magazine, the American Metal Market. A surplus dealer is a dealer that will purchase excess finished parts at a deep discount, for example *673 ten cents a pound, and then resell the part to a customer at a markup. Petitioner's vice president Buehler knew that ideally, it would be preferable to keep inventory indefinitely, because the demands of Bosch's customers for replacement parts could continue indefinitely. Financial constraints nevertheless indicated that it was unprofitable to retain a part after a relatively short interval. Bosch's APA division began dealing with SAJAC and Valley Parts in December of 1978, the OEM division in 1979. The negotiations for the APA were carried on by Nordstrom and approved by Buehler. The negotiations for the OEM were carried on by Verona. Nordstrom had first heard of SAJAC at a seminar at the University of Wisconsin that he attended prior to employment with petitioner. When the APA faced an excess inventory problem in 1978 and Nordstrom was asked to deal with it, he thought of SAJAC. He contacted SAJAC and requested a presentation as to the nature of SAJAC's business. In October of 1978, Lemon of SAJAC sent a letter to Nordstom of Bosch, describing the services of SAJAC, along with a dormant inventory proposal and a description of services. The letter stated, "Our basic purpose *674 is to help you reduce your inventory ownership costs without reducing the availability of parts to your customers." With the letter, Lemon included a "Description of Services," which stated, in relevant part: SAJAC is a long term dormant warehouse, providing manufacturers with the space and tax saving benefits of scrapping excess and inactive inventory, yet retaining its availability for possible future use. We accomplish this by purchasing manufacturer's inventory at local scrap prices, committing it to long term storage (8 to 16 years), and reselling individual parts to the manufacturers at less than his current cost whenever he has a need. Our service includes old patterns, dies, fixtures and tooling. We own and store about 400,000 parts in 13 warehouses covering 260,000 square feet in Wisconsin, Illinois, Ohio and Oklahoma. * * * SAJAC's service lets its customers reinvest the 50% corporate income tax dollars saved into more profitable areas than slow moving inventory. Their small annual repurchases are frequently less than their cost of renting or building factory or warehouse additions had they retained the inventory. If you already have an aggressive scrapping *675 program, SAJAC can reduce the small unprofitable runs for service parts that hinder manufacturing efficiency. SAJAC has a 9 year reliability record of conducting its operations in a careful and responsible manner to protect its customers from questionable tax practices and product liability exposure pertaining to the inventory it owns. The letter included another document, setting forth a draft proposal, which, it its entirety, stated as follows: SUBJECT: Dormant Inventory Proposal We are submitting the following proposal for your consideration and acceptance, to purchase your inactive and excess inventory. 1. SAJAC will purchase mutually agreed upon inventory at local mixed scrap prices. 2. SAJAC will transport and store their inventory in warehouses, where it will be available for resale. 3. You may purchase any portion of our inventory at one of the following: 1. 90%
of your current cost.
2. 90%
standard cost plus an
inflation factor from
date of last manufacture.
3. %   of your selling price.
When frequent orders
of inexpensive parts are
involved SAJAC may
use a handling charge of
$ per line item.   4. This *676 agreement may be cancelled by either party by notification 60 days in advance in writing. Upon cancellation, SAJAC will dispose of all their inventory. ACCEPTED BY
OFFERED BY
SAJAC COMPANY, INC.
Jack Lemon, President
Buehler and Nordstrom saw an advantage to disposing of excess and obsolete inventory to SAJAC over a scrap dealer, because a scrap dealer would destroy the inventory it obtained. Most of the APA's supplies came from Europe or South America. Petitioner's facilities would not manufacture only one part. An inventory run would have to be made and APA would have to purchase and pay for the lot just to get one part, thus leaving APA with more excess inventory that would again be a problem. In addition, there was the inconvenience of waiting for a part from overseas. In some cases the foreign facility would not manufacture the part even as part of a small inventory run. On the other hand, SAJAC offered to deliver, within 48 hours, any given part from its inventory at a discount from current manufacturing costs. Bosch could transfer the inventory with a general assurance that it would be available for repurchase if needed and not be resold to its *677 customers in the meantime. The inventory situation of the OEM was different than that of the APA. Verona explained that the OEM dealt directly with original equipment manufacturers. As a result, the OEM did not have the aftermarket responsibility and concern over SAJAC supplying parts to Bosch's warehouse distributors and key jobbers, concerns and responsibilities that the APA had. The OEM solicited bids for the purpose of disposing of excess or obsolete inventory and scrap material, and before dealing with SAJAC it sold excess and obsolete parts to surplus dealers. The agreement between petitioner and SAJAC was an unwritten agreement, entered into in 1978. Commencing in 1979 and continuing through June of 1986, the OEM division and the APA division of Bosch transferred excess and obsolete inventory to SAJAC, in bulk, by the pound. Excess inventory, in the case of the OEM, was inventory in excess of a 12-month supply that the OEM's inventory executives determined would not be sold, and, in the case of the APA, was inventory in excess of a 24-month supply that the APA's inventory executives determined would not be sold. Obsolete inventory is inventory that cannot be sold due *678 to new developments in product lines or engineering changes. All material transferred to SAJAC was transferred pursuant to the unwritten agreement with Bosch. In the case of the OEM, the inventory was first offered for sale throughout the worldwide Bosch organization before being offered for sale to SAJAC or Valley Parts. If the inventory could not be sold within the Bosch organization, the OEM then offered the inventory to scrap and surplus dealers. In general, since the parts were being sold as scrap, the local dealers offered scrap prices. If SAJAC or Valley Parts met such prices, or came close, the OEM would often sell the inventory to these companies. Although the APA did not follow the practice of obtaining competitive bids as did the OEM, the prices which APA received from SAJAC and Valley Parts were similar to the prices which the OEM received from SAJAC and Valley Parts. SAJAC was competitive with scrap bids which the OEM received from local scrap dealers, that is, approximately two and one-half cents per pound for proprietary parts. In general, the excess or obsolete parts that were sold to SAJAC were proprietary parts, that is parts that were suitable specifically *679 for Bosch equipment such as Bosch diesel pumps. In the case of Valley Parts the parts sold were surplus or "vender" parts -- parts that could be resold for use without reference to specific Bosch equipment such as spark plugs, etc. As indicated above, petitioner received more for surplus parts than it did for parts sold for scrap. Petitioner receives a price for scrap sales generally based on the American Metal Market listings. Bosch received approximately ten cents per pound for the material that went to Valley Parts, four times as much as that which went to SAJAC. During the years in issue, Bosch executives discovered that some of the material transferred to Valley Parts reappeared in Bosch's dealer return program. This meant that Bosch was required to repurchase from its dealers, at the original list price, some excess material that it had previously sold to Valley Parts at ten cents a pound. After the dealer return incident, Bosch ceased doing business with Valley Parts and did not send any material to Valley Parts after 1980. Bosch executives operated under the impression that Valley Parts was controlled by SAJAC, and on occasion, would consult the personnel of SAJAC about *680 problems, like the dealer return problem, that had arisen with Valley Parts. The transactions between Bosch and SAJAC were documented and treated as sales by both parties. If a determination was made that some parts were obsolete or in excess supply and could not be sold, the OEM or the APA, as the case may be, physically shipped such parts to SAJAC or Valley Parts. Shipping documents, including invoices and freight bills, described each sale in terms of the parts being sold, the quantity thereof, the weight, and the price per pound, and the total price of the shipment. Bosch continued to deal with other surplus dealers after it commenced its relationship with SAJAC and Valley Parts. Most of Bosch's excess inventory was disposed of to others or destroyed during 1979 and 1980; in 1981, however, Bosch sold $ 2,669,408 worth of inventory to SAJAC, while $ 1,330,337 went to others, and $ 421,488 worth was destroyed. The total cost of goods sold of the inventory sold to SAJAC or Valley Parts for the period 1979 through 1981 was $ 3,972,335. The total sales by year were as follows: Cost of Goods Sold
Price
Valley
paid to
Year
Division
SAJAC
Parts Total
Petitioner
1979
APA
$ 126,711  $ 17,427 $ 144,138  1979
OEM
0
590,414
590,414
Total
126,711
607,841
734,552
$ 9,679    1980
APA
558,133
10,242
568,375
1980
OEM
0
0
0
Total
558,133
10,242
568,375
705   1981
APA
2,057,312
0
2,057,312
1981
OEM
612,096
0
612,096
Total
2,669,408
0
2,669,408
6,346   SUMMARY
APA
2,742,156
27,669
2,769,825
OEM
612,096
590,414
1,202,510
TOTAL
$ 3,354,252
$ 618,083
$ 3,972,335
$ 16,730   *681 Petitioner included the amounts of the purchase price received from SAJAC and Valley Parts in income and deducted the cost of goods sold. There is no dispute as to the amount of petitioner's cost of goods sold, or that excess or obsolete inventory was actually transferred to SAJAC and Valley Parts, only as to whether the amounts are allowable deductions to petitioner during the years in issue. In general, SAJAC maintained the Bosch inventory which it purchased and accepted into its warehouse in a good marketable condition, at its own expense. During the years at issue, SAJAC rejected small amounts of these inventory items as defective; in 1979, it rejected $ 7.65 worth of inventory; it rejected none in 1980; and in 1981, it rejected $ 38.78 worth. On occasion, SAJAC simply scrapped some other unacceptable material upon receipt, when the material was not of a quality to justify the expense of cataloguing and storing. Neither the OEM nor the APA kept internally generated records of the inventory transferred to SAJAC other than to compute the cost of goods sold, but SAJAC would supply computerized listings of Bosch material to Bosch. Bosch was not sent lists of inventory transferred *682 by other manufacturers to SAJAC. From time to time Bosch's APA or OEM divisions would receive a request for a part (APA) or would require a part in connection with equipment design for another manufacturer (OEM). In such instances, Bosch would check its facilities, including its vendors, to determine if the part were in stock. If the part were not in stock or were otherwise unavailable, Bosch would check the monthly parts availability list it received from SAJAC, or otherwise contact SAJAC to see if the part were available. SAJAC would then perform a parts inquiry to determine if the part was still available in SAJAC facilities. If the part were available, SAJAC warehouse personnel would pick the part and prepare it for shipment. In the case of the OEM, the repurchase price was calculated at a 10 percent discount from petitioner's current cost of itself producing or otherwise obtaining an identical part. In the case of the APA, the repurchase price from SAJAC and Valley Parts was calculated at a 19 percent discount from petitioner's current unit landed costs of an identical part manufactured by petitioners's foreign affiliate. The current landed cost was determined on the *683 basis of cost, plus freight, insurance, and customs. The sum of 9 percent of cost was estimated as the cost of freight, insurance, and customs. In asking for this additional 9 percent discount over the OEM, the APA contended that SAJAC and Valley Parts should not receive the portion of the current price that corresponded to these items. In sum, then, if a part were reacquired by the OEM division of Bosch, SAJAC would charge it 90 percent of Bosch's current standard production cost. If a part were reacquired by the APA division of Bosch, SAJAC would charge it 81 percent of the current landed cost price. Occasionally, the parties negotiated a special reacquisition price, but this was not the usual business relationship. Such instances occurred when, for example, Bosch found it could use a formerly obsolete inventory item as a constituent of a new product line. The special reacquisition price would often be lower than the usual 90 or 81 percent replacement cost charge to Bosch, but Bosch's failure to anticipate the need for such parts nevertheless cost it money when it was required to repurchase the parts involved from SAJAC. During the years in issue, SAJAC did not have any *684 records of Bosch's current costs for its inventory, nor did it have a way to determine what Bosch's costs were for a particular part. It did, however, develop a history of dealing with respect to certain parts that provided a basis for estimating current costs upon which resales to Bosch took place. SAJAC would ship the part to petitioner at petitioner's expense, with an invoice. In rare instances, under its "VOR" policy, Bosch asked SAJAC to send a part directly to a customer. "VOR" stands for "vehicle off the road," and indicated an emergency situation when a vehicle that was vital to a customer's operation was inoperative because it lacked the Bosch part. In ordinary circumstances, Bosch reacquired the parts and shipped them to its customers itself, because, as Buehler explained, "Our customers like that the part comes from us." Bosch never acquired parts from SAJAC that had been manufactured by companies other than Bosch. Bosch generally had no need for such parts other than its own, for it sold its own products to other users. If the part sought were unavailable from SAJAC, Bosch would have the part manufactured in single or small-lot quantities to satisfy the customer's *685 need. As indicated above, this process often involved ordering the part from Bosch's German or Brazilian affiliates. Single or small-run production disrupted the manufacture of current production parts, involved the expensive process of setting up of machines to manufacture the part, took from three to nine months to complete, and resulted in the customers receiving the part after a considerable wait. During the period from 1979 through 1981, petitioner paid to SAJAC the following total amounts as the purchase price for the individual parts repurchased. Paid by
Paid by
Year
APA
OEM
Total Paid
1979
$ 45,646 $ 6,159 $ 51,805 1980
77,579   8,563   86,142   1981
88,628   7,312   95,940   Total
$ 211,853
$ 22,034
$ 233,887
Petitioner treated the $ 233,887 purchase price paid for the individual parts repurchased from SAJAC as cost, and, upon sale of the parts to customers, deducted these amounts as cost of goods sold. The parts repurchased were sold in the year of repurchase. On occasion, when Bosch had decided to purchase specific items from SAJAC's inventory, its personnel would direct SAJAC about the manner *686 of its packaging and shipment. During the years in issue, petitioner sold SAJAC 288,719 pounds of inventory and repurchased some 32,992 pounds, or some 11 percent of the amount sold. For all the years they did business together, petitioner repurchased 19 percent by weight of the inventory it sold to SAJAC and Valley Parts. SAJAC and Valley Parts retained much of the remainder and scrapped or sold the rest to third parties. Almost all of the gross income generated to SAJAC as a result of the "SAJAC Concept," however, came from resales to original manufacturers; the receipts from scrapping and sales to third parties were not significant. There was no written agreement between petitioner, SAJAC, and Valley Parts whereby SAJAC or Valley Parts was obligated to or agreed to store inventory for the account of petitioner. It was understood by the OEM and the APA that Valley Parts intended to resell the parts it purchased as surplus. It was further understood by the OEM and the APA that SAJAC intended to store inventory that it purchased with a view toward its ultimate resale to the manufacturer from which it had been acquired. The storage was at SAJAC's risk and for SAJAC's account. *687 Petitioner had no written obligation to pay SAJAC or Valley Parts a storage fee or to repurchase any individual parts. If, however, SAJAC competed with the APA by selling inventory to the APA's 600 warehouse distributors or key jobbers with which it had contracts, the APA would not continue selling inventory to SAJAC. The APA's Buehler testified that there were many potential customers, such as unrelated jobbers or department stores, to which surplus parts could be sold without constituting sales to Bosch's customers. Petitioner wrote off the parts sold to SAJAC and Valley Parts for both tax and accounting purposes. In at least one of petitioner's internal documents, prepared during the years in issue, the word "storage" was used in reference to inventory sold to SAJAC. In another instance, one of petitioner's internal documents referred to inventory in the possession of SAJAC as "warehoused for Bosch." Petitioner's inventory managers explained that these items were shorthand usages not meant to characterize the transactions as being inconsistent with sales to SAJAC. In a memorandum written in October of 1980, Lemon, the president of SAJAC, informed his colleagues that he *688 had told petitioners' Buehler and Nordstrom the following: I assured them that all "G" material bought by Sajac is there and subject to audit. I assured that Sajac never has, or will, sell inventory to others, except the manufacturer it was purchased from. I explained, as an owner, we need the goodwill of our customers, and want to be involved in any reports that Sajac has done anything other than its policy. Financially, Sajac needs the continuing good will of all its customers because of our long term financial commitments on our warehouses. This memorandum appears to be part of Lemon's attempt to placate Bosch for the problem relating to the reappearance of material sold by Bosch to Valley Parts being returned in Bosch's dealer return program. Lemon, as well as being president of SAJAC, also owned 100 percent of Valley Parts, and Bosch's executives knew of that relationship. During the years in issue, SAJAC sold Bosch inventory only to Bosch. SAJAC did not have a sales force to sell its inventory at the retail level because the market for its inventory was the manufacturer who would discover that it needed inventory that it had previously sold to SAJAC. Beginning in *689 1983, however, SAJAC began selling Bosch inventory as scrap or surplus to other dealers. Bosch's Nordstrom in fact suggested to SAJAC a major third-party customer to which SAJAC could and did sell its Bosch inventory. Valley Parts, on the other hand, as a surplus dealer, routinely made sales to third parties during the years at issue. During the years in issue, of the $ 66,695 amount of Bosch inventory sold to third parties by Valley Parts, $ 28,091 was sold to SAJAC. SAJAC's accountants estimated that, of the inventory which SAJAC purchased from its customers, no more than 30 percent by weight could reasonably be expected to be sold except as scrap and that such sales occurred over an extended period of time. They concluded that after eight years in SAJAC's warehouse, there was little chance that any remaining inventory would be sold. They accordingly amortized the cost of the 70 percent that was not expected to be resold over the 8-year period by charging the costs against earnings over that period. On June 11, 1979, SAJAC entered into a Revolving Credit Agreement with the Wisconsin Marine Bank of Milwaukee in which SAJAC pledged all the inventory in its possession as partial *690 security for what was ultimately a $ 2.5 million line of credit. The pledge covered all of SAJAC's inventory including that purchased from petitioner. The pledge of inventory alone, however, would not have provided sufficient security for the loan. The bank, in fact, did not appraise the inventory. Credit was extended to SAJAC based primarily on SAJAC's income from its dealings with the inventory stored at its facilities. SAJAC paid personal property taxes in each of the states in which its warehouses were located and which imposed taxes with respect to the inventory stored in the warehouses, including the inventory purchased from petitioner. The sums paid were relatively minor, however, and no state conducted an appraisal of the property. At all relevant times, SAJAC has carried business interruption insurance designating itself as the insured. After the years in issue, Wellenseik of SAJAC determined that the business interruption insurance was "not what we thought it was," and arranged for expanded coverage that would insure SAJAC against accidents that mixed up the parts in inventory causing a "loss of identity" that would prevent SAJAC from filling orders. Respondent disallowed *691 petitioner's deductions, as cost of goods sold, of the losses on inventory transferred to SAJAC and Valley Parts in the years at issue. Respondent maintains that the transfers do not constitute sales, but rather that they are warehousing arrangements that do not give rise to the deductions claimed. OPINION Petitioner Robert Bosch Corporation imports, manufactures, and distributes automobile parts and components. During the years at issue, it kept an inventory of its products sufficient to meet one year's requirements, or two years' requirements, depending upon the nature of the inventory involved. Petitioner's executives determined that inventory over and above those requirements was generally either "excess" or "obsolete." Petitioner's policy was to get rid of excess or obsolete inventory. It therefore sold some of that excess or obsolete inventory at scrap prices to SAJAC, Inc. A restriction that petitioner placed upon SAJAC's subsequent disposition of that inventory was that SAJAC could not sell the inventory to petitioner's existing customers. SAJAC's policy, advertised to customers as the "SAJAC Concept," was to retain the inventory it purchased from a manufacturer for *692 possible resale to that manufacturer, in the event that the manufacturer later discovered a need for a replacement part that was no longer in the manufacturer's own inventory. Depending upon the nature of the inventory involved, SAJAC's repurchase prices to petitioner were generally either 81 percent or 90 percent of petitioner's costs of replacing that inventory by other means. Petitioner deducted the losses resulting from the sale of its excess and obsolete inventory to SAJAC. Respondent disallowed those losses, asserting that petitioner maintained too much control of the inventory transferred for that inventory to be considered as "sold" to SAJAC. Respondent concluded that the sales involved were merely shams that should be disregarded for tax purposes. We must therefore determine whether petitioner's transfers to SAJAC were valid sales. Respondent's objections to petitioner's cost-of-goods sold deduction is based upon the holding in Thor Power Tool Co. v. Commissioner, 64 T.C. 154 (1975), affd. 563 F.2d 861 (7th Cir. 1977), affd. 439 U.S. 522 (1979). In Thor Power, the taxpayer, a manufacturer, sought to retain "excess" inventory *693 items for possible sale at their original prices and at the same time claim, for tax purposes, inventory losses resulting from lowering the valuation of that inventory, as carried on the taxpayer's records, to scrap value. The attempt ran afoul of the regulations which required the taxpayer to value its inventory at the lower of actual cost or replacement cost, unless the taxpayer could demonstrate an even lower value either by actually offering the items for sale at that lower price or by showing that the items were defective. The taxpayer could neither show that it had offered the goods for sale at scrap prices in the regular course of business, nor could it show that the goods were defective and thus had value only as scrap. We accordingly accepted respondent's determination that the attempted writedown did not clearly reflect the taxpayer's income and would be ignored for tax purposes. Following the decision in Thor Power, respondent became concerned that a means had been devised to circumvent that holding. Section 1.471-1, Income Tax Regs., provides that a taxpayer's inventory must be reduced by the value of goods sold. A taxpayer's ostensible "sale" of excess inventory *694 to a compliant buyer, who would hold the inventory only for resale to the taxpayer, would theoretically enable a taxpayer to reduce its inventory by the value of the excess inventory sold. Such a "sale," however, would still preserve the taxpayer's control over that inventory by virtue of the understanding between the seller and the buyer. Thus, while Thor Power precludes a taxpayer from writing down its inventory to scrap value while still retaining that inventory for sale at normal prices, a taxpayer might achieve the same result through a "sale" to a sympathetic buyer. In simplified terms, the gross income of a taxpayer who maintains inventories is determined by subtracting the cost of goods sold from total sales for the taxable year. The cost of goods sold, in turn, is derived by subtracting the ending inventory from the total inventory available during the year -- that is, from the sum of the beginning inventory plus inventory purchases. A reduction in the ending inventory, either by sales of inventory or by a writedown to scrap value, will thus increase the cost of goods sold. It then follows that an increase in cost of goods sold will decrease the amount of gross income. *695 Accordingly, in 1983, respondent published Rev. Rul. 83-59, 1983-1 C.B. 103, in which he determined: A manufacturer may not reduce its ending inventory based on purported sales of "excess" inventory at scrap value, when under the sales arrangement the manufacturer continues to possess, as a matter of fact, the benefits and burdens of ownership with respect to the "excess" inventory. This type of transaction is not a bona fide sale for federal income tax purposes. In Paccar, Inc. v. Commissioner, 85 T.C. 754 (1985), affd. 849 F.2d 393 (9th Cir. 1987), the situation generally was that addressed in Rev. Rul. 83-59 and presented again in the instant case. In Paccar, the taxpayer (Paccar) transferred surplus and obsolete inventory to SAJAC with the understanding that it might repurchase some of the items transferred as needed. In Paccar, we agreed with respondent that the "sales" of inventory at issue were a mere artifice by which the taxpayer could claim losses from the reduction in the value of its inventory while still retaining the control of that inventory. We held (85 T.C. at 782, 783) that the *696 transaction at issue was only a "thinly veiled subterfuge of a 'sale' * * * designed to circumvent our holding in Thor." In affirming, the Court of Appeals stated (849 F.2d at 399): Because Paccar retained the same control over the inventory that it had before shipping it to Sajac, the tax court properly concluded that the transfer did not constitute a "sale" * * *. Another case that is very similar to Paccar is Clark Equipment Co. v. Commissioner, T.C. Memo. 1988-111, which was decided after the parties had filed their briefs in this case. In Clark, the taxpayer (Clark) again transferred excess inventory to SAJAC. And in Clark, as in Paccar, we held that the transferor retained so much control over the subject inventory that its transfer to SAJAC could not be treated as a sale. Both in Paccar and in Clark, we employed the familiar substance-over-form analysis. It is, of course, basic that the economic substance of a transaction, rather than its form, governs whether a transaction is a bona fide sale for income tax purposes. Gregory v. Helvering, 293 U.S. 465, 470 (1935). In analyzing whether a sale *697 has actually taken place, the courts will thus look to "the objective economic realities of a transaction rather than to the particular form the parties employed." Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978). Even when the form of a transaction is that of a "sale," the courts need not treat the transaction as a sale where the substance of the transaction is that the transferor has retained effective control over items allegedly sold. In such cases, a sale may be vitiated even when the transferor does not retain control through formal contractual provisions. Thus, the courts have refused to regard as "sales" transactions where the seller retained "sufficient dominion" over the buyer, Fender Trust No. 1 v. United States, 577 F.2d 934, 937 (5th Cir. 1978); or where there were "ties of affectionate interest" between seller and buyer, DuPont v. Commissioner, 118 F.2d 544, 545 (3d Cir. 1941), cert. denied 314 U.S. 623 (1941); or where the seller retained effective control over the items sold and was "practically compelled" to repurchase, notwithstanding the lack of a formal requirement to do so, Comtel Corp. v. Commissioner, 45 T.C. 294, 307 (1965), *698 affd. 376 F.2d 791 (2d Cir. 1967), cert. denied 389 U.S. 929 (1967). In Paccar and Clark, we found that the transferors (i.e., Paccar and Clark) had explicitly, and at their own insistence, demanded and received written contractual assurances from SAJAC that guaranteed to the transferors continuing control of the inventory transferred to SAJAC. The control retained by the transferors was, in our view, sufficient to show that the transfers were not, in substance, sales, but rather disguised warehousing arrangements that did not permit the claimed cost of goods sold deductions. In this case, petitioner urges that, on the record presented, Paccar (and presumably Clark) are inapplicable, because here, Bosch disclaimed any future control over the inventory transferred to SAJAC. We disagree. Bosch's disclaimer of the control, though genuine, was ineffective because SAJAC nevertheless ceded such control to Bosch. The heart of the SAJAC Concept was SAJAC's policy of making Bosch's excess inventory available when Bosch might need it. Accordingly, the very nature of the SAJAC Concept "practically compelled" SAJAC to leave control over the Bosch *699 inventory SAJAC had acquired in the hands of Bosch. In Paccar, we listed four factors that focused on the control Paccar retained over its inventory in determining that no valid sale had taken place. We utilized the same four-factor analysis in Clark to reach a similar result. Respondent urges that these four factors, when analyzed under the facts of this case, show that here, as in Paccar, there was no valid sale. We agree, for the reasons set forth below in our discussion of those factors. In Paccar, we said (85 T.C. at 779): In our view, the following four factors should be considered in determining the character of the transactions between petitioner and SAJAC: (1) Who determined what items were taken into inventory; (2) who determined when to scrap existing inventory; (3) who determined when to sell inventory; and (4) who decided whether to alter inventory. * * * (1) What items taken into inventory. In Paccar, we determined that "SAJAC exercised no discretion over what it accepted into inventory and therefore accepted even worthless inventory. * * * SAJAC never refused a shipment of parts from any of petitioner's divisions. Thus, *700 with respect to this element we conclude that petitioner behaved as if SAJAC was merely warehousing the inventory for petitioner's future use." Paccar v. Commissioner, supra at 779-780. As to this first factor -- who decided what would be taken into inventory -- the facts in Clark, however, seem to indicate that, like the situation in the present case, SAJAC did in fact exercise some discretion in determining what materials it would retain. Both in Clark and in this case SAJAC rejected a few items and discarded some others. In Clark, we nevertheless discounted that factor saying "It is the continuing control of petitioner over inventory accepted by Sajac that is significant to our decision." Clark Equipment Co. v. Commissioner, supra at 393 (emphasis added). That observation is appropriate here. On this record, SAJAC accepted almost indiscriminately anything that was not hazardous and could be warehoused for a long time period. Thus, as a practical matter, Bosch determined what materials would go into SAJAC's inventory. And, as we discussed in Clark, the few rejections made by SAJAC were not inconsistent with ownership of the remainder *701 by Bosch. It is Bosch's effective continuing control over the items retained by SAJAC that prevents their transfer from being deemed a "sale." (2) Who determined when to scrap. In Paccar, and in Clark, we determined that the taxpayers, and not SAJAC, had retained specific contractual control over decisions about when the material they had sent to SAJAC could be scrapped. In Paccar, for example, SAJAC contracted in writing not to scrap the material for a period of four years. In Clark, SAJAC agreed in writing to scrap Clark inventory only when Clark instructed it to do so, or when the agreement was cancelled. In the present case, however, the executives of Bosch specifically declined to take any part in decisions as to when SAJAC might scrap the materials obtained from Bosch. These disavowals by Bosch, however, do not alter the substance of the transaction. As a practical matter, SAJAC was not free to scrap the materials at its sole discretion. To the contrary, SAJAC's program depended upon SAJAC's retaining the material. SAJAC's own offering materials stated that it would commit the materials to "long-term storage (8 to 16 years)" in the event that *702 its customer would again need the parts. It was thus unnecessary for Bosch to make SAJAC agree in writing to retain the materials; under SAJAC's policy it was "practically compelled" to retain them anyway. We note, in this regard, that we have been shown no example where Bosch wanted a part from SAJAC that was unavailable because SAJAC had already scrapped it. (3) Who decided when to sell. In Paccar, SAJAC was denied the rights to sell the parts in its warehouse to anyone but Paccar for a period of 4 years. In addition, SAJAC was restricted from selling the parts as anything other than scrap once the 4 years had expired. In Clark, SAJAC agreed in writing to "refrain from selling or disposing of inventory to anyone other than Clark." Again, in the present case, the officials of Bosch eschewed any role in directing SAJAC as to the decision when to sell. The natural course of SAJAC's business, however, indicated that its only practical course, and the one consistent with its policy, was to sell Bosch materials only to Bosch, and then only when Bosch wanted to buy. Indeed, when faced with Bosch's displeasure at Valley Parts' resale of some Bosch Parts, SAJAC's president *703 Lemon promised Bosch "that Sajac never has, or will, sell inventory to others, except the manufacturer it was purchased from." Here Bosch had effective control over SAJAC's decisions when to sell Bosch inventory, not because Bosch had contracted for that control, but rather because SAJAC, pursuant to its policy, voluntarily gave that control to Bosch. In this regard, SAJAC's offering materials to Bosch stated that SAJAC would resell inventory to the customer who sold it to SAJAC "at less than his current costs whenever he has a need." (Emphasis supplied.) We note again that we have been shown no instance wherein SAJAC had sold a Bosch part to anyone other than Bosch during the years in issue. Even in later years, where there were such third party sales, there is no showing that any such sales deprived Bosch of a part that it wanted. (4) Who had the right to alter inventory. In Paccar, we noted that SAJAC had acquiesced to Paccar's directions as to the alteration of inventory transferred to SAJAC. Neither in Clark nor in the present case were facts presented concerning any alteration of the inventory in question. In Clark we noted that Clark had not shown *704 that SAJAC altered inventory in any way inconsistent with Clark's wishes; and the same is true here; Bosch has not shown that SAJAC altered inventory in any way inconsistent with Bosch's wishes. In fact, the opposite is true -- when Bosch wanted SAJAC to package repurchased inventory in a particular manner, SAJAC was happy to oblige. Because Bosch retained effective control over the inventory transferred to SAJAC, we conclude that the transactions at issue, like those in Paccar and Clark, were not, in substance, sales. As in those cases, SAJAC accepted all inventory that was usable; it resold that inventory to no one but Bosch, and, in general, it acted more as a warehouseman than as a dealer in excess inventory. Petitioner has demonstrated convincingly that the dealings between SAJAC and Bosch were made at arm's-length and that SAJAC was an independent and viable corporation. Those factors, however, do not affect our determination that the transactions at issue were not sales. SAJAC did not -- and for all practical purposes could not -- exercise sufficient control over the inventory transferred by Bosch to be deemed the purchaser of the inventory. As we stated in *705 Clark, "The only substantial right obtained by SAJAC under the agreement was the right to receive an agreed amount for any item 'repurchased' by petitioner." Accordingly, as in Paccar and Clark, we hold that petitioner is not entitled to recognize an inventory loss on the items transferred to SAJAC. Our conclusion is different, however, with respect to the transfers made by Bosch to Valley Parts. Respondent disallowed petitioner's cost of goods sold not only for sales to SAJAC but also for sales to Valley Parts. In this case, the parties have not always distinguished between those two entities. Nevertheless, the reasoning that leads to our determination that the sales to SAJAC were not valid sales requires a finding that petitioner's sales to Valley Parts were valid sales. To be sure, Valley Parts was controlled by the same individuals who controlled SAJAC. The executives of Bosch sometimes thought that communications to the executives of SAJAC were effectively communications to Valley Parts as well. But Valley Parts' business was different. It was a dealer in surplus that looked for its profits to a fast turnover in inventory to third parties as well as *706 to the manufacturer who sold it the inventory in the first place. Unlike SAJAC, Valley Parts clearly ceded to Bosch no control over the property transferred by Bosch. Indeed, Valley Parts was free to, and did, resell Bosch parts to third parties immediately; that was the nature of its business. Indeed, the fact that it dealt with third parties caused a termination of business between Bosch and Valley Parts; as noted above, Bosch ceased doing business with Valley Parts because some of its sales to third parties were being returned to Bosch as part of the "dealer return" program. Moreover, the repurchases made by Bosch from Valley Parts were minimal -- of 240,497 pounds of inventory sold to Valley Parts, Bosch repurchased only 1,592 pounds, and that only in the year 1980. These factors demonstrate that Bosch's transfers to Valley Parts included transfers of control as well, and that Valley Parts proceeded to exercise that control as the new owner of the inventory. The transfers from Bosch to Valley Parts were sales and not, as respondent urges, disguised warehousing transactions with Valley Parts. Accordingly, cost-of-goods sold adjustments relating to Valley Parts' acquisitions *707 from Bosch are valid and may be recognized. Respondent has requested that we treat the Bosch transactions with SAJAC and Valley Parts as "shams" within the meaning of section 6621(c)(3)(A)(v). He accordingly asks, pursuant to that provision, that the interest payable on underpayments attributable to Bosch's transactions with SAJAC be computed at 120 percent of the rate that would otherwise be applied. Section 6621(c) applies an increased interest rate to underpayments resulting from "tax motivated transactions." A provision expanding the scope of that section to include specifically underpayments resulting from "any sham or fraudulent transaction" was added in 1986. The rationale for this addition to the Code is set forth in the Statement of the Managers attached to the Conference report (H. Rept. 99-841 (Conf.) II-796 (1986), 1986-3 C.B. (Vol. 4) 796): The Tax Court has recently held * * * that sham transactions that would be subject to this special interest rate were they not shams are not subject to this special interest rate because they are shams. The conferees view it as anomalous that a genuine transaction (lacking the proper profit motive) would be subject *708 to a higher interest rate, while a sham transaction, which is significantly more abusive, would escape the higher interest rate simply because it is a sham. Accordingly, the conference agreement, consistent with the legislative intent in originally enacting section 6621(d) in 1984 [redesignated as sec. 6621(c) by the Tax Reform Act of 1986], explicitly adds sham or fraudulent transactions to the list of transactions subject to this higher interest rate. The intent of the conferees is to reverse the holding of these Tax Court cases on this issue. We have since stated that "A transaction * * * that lacks economic substance or business purpose is a sham transaction under section 6621(c)(3)(A)(V)." McCrary v. Commissioner, 92 T.C. 827, 857 (1989). Here we have recharacterized the transactions between petitioner and SAJAC as not constituting sales but as representing a storage agency relationship. However, we do not believe that such recharacterization comes within the definition of "fraudulent or sham transaction" within the meaning of section 6621(c)(3)(A)(v). To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. During the course of trial, petitioner was permitted to amend its petition to assert an overpayment based upon the carryback of possible net operating losses from 1983 to 1980. The purpose of the motion was to keep the year 1980 open for subsequent consideration of the claimed carrybacks from 1983.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩