**REXNORD, INC., Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

**No. 90–2903.**

United States Court of Appeals, Seventh Circuit.

Argued April 10, 1991.

Decided Aug. 21, 1991.

---

Timothy C. Frautschi, Lynette M. Zigman, Foley & Lardner, Milwaukee, Wis., for plaintiff-appellant.

John E. Fryatt, U.S. Atty., Office of the U.S. Atty., Milwaukee, Wis., Gary R. Allen, David I. Pincus, Teresa T. Milton, Thomas D. Sykes, Dept. of Justice, Tax Div., Washington, D.C., for defendant-appellee.

Before BAUER, Chief Judge, COFFEY, Circuit Judge, and WILL, Senior District Judge.[*]

WILL, Senior District Judge.

Rexnord, Inc. claimed inventory losses in its 1977 and 1978 federal corporate tax returns based on its transfers of excess and obsolete inventory to a company called S.R. Sales. The IRS determined that these transfers were not bona fide sales and disallowed the write off losses. Rexnord paid additional tax assessments and sought a refund, which the IRS denied. Rexnord then filed suit in district court. The district court agreed with the IRS that, for federal tax purposes, the transactions were not true sales. We affirm.

Rexnord Inc. is a manufacturer of process and construction machinery, power transmission components, specialty fasteners, material handling systems and environmental control equipment, with facilities in Wisconsin and Illinois. Between 1966 and 1974, Rexnord's three divisions, Agricultural Components, Engineered Chain and Racine Fluid Power, and its subsidiary, Envirex Inc. (hereinafter collectively called "Rexnord") entered into four separate contracts under which they transferred excess inventory to S.R. Sales Company, Inc., located in Wisconsin.

S.R. Sales offered Rexnord an alternative to scrapping. The various contracts provided that S.R. Sales would buy inventory from Rexnord at a price tied to its scrap value, which could later be repurchased by Rexnord in part or whole either at its manufacturing cost or at a price determined by the price Rexnord wanted to sell the goods

---

[*] The Honorable Hubert L. Will, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

to a customer. All inventory was marked with Rexnord's inventory numbers so it could be easily reacquired when the need arose. In three of the contracts, S.R. Sales agreed to purchase all obsolete and slow moving inventory of a certain general description which was offered by Rexnord and under the fourth, the items transferred were to be "mutually agreed upon." The agreements gave S.R. Sales title and the ability to sell to third parties without notice to or approval from Rexnord, with the requirement under three contracts that it remove Rexnord's trademark prior to any sale in the general market.

In its federal tax returns for fiscal years ending October 31, 1977 and 1978, Rexnord treated its transactions with S.R. Sales as outright inventory sales. In simplified terms, this tax treatment decreased Rexnord's ending inventory, thereby increasing its cost of goods sold which in turn reduced its taxable income. Rexnord claimed deductions for the resulting losses. Following a 1983 audit, the IRS disallowed the deductions, finding that Rexnord's transactions with S.R. Sales were not true sales, and assessed a $125,670 deficiency based on Rexnord's 1977 tax returns and $130,035 for 1978. Rexnord paid both assessments. After the IRS denied Rexnord a refund, Rexnord sued for a $255,705 refund in district court. Following a bench trial, the district court agreed with the government that Rexnord had not established a valid inventory loss. This appeal followed.

The parties dispute the proper standard of review to be applied in this case. Rexnord contends that the issue of whether there has been a bona fide sale is a pure question of law which should be given plenary review. Rexnord cites *Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1977), where the Court, examining the proper tax consequences of a sale-leaseback arrangement, dropped a footnote stating "[t]he general characterization of a transaction for tax purposes is a question of law subject to review." Further support for this argument comes from *Paccar, Inc. v. Commissioner*, 849 F.2d 393 (9th Cir.1988), where

the identical question posed here was reviewed de novo.

The government argues that we are faced with a mixed question of law and fact requiring us to apply a clearly erroneous standard. That "mixed" questions, loosely defined as the application of a legal principle to particular facts, are reviewed in this circuit under a deferential standard is not beyond dispute. *Compare Schuneman v. United States*, 783 F.2d 694, 699 (7th Cir. 1986) ("... mixed questions of law and fact ... are independently reviewable by an appellate court.") *with Standard Office Bldg. Corp. v. United States*, 819 F.2d 1371, 1374 (7th Cir.1988) (application of legal standard to facts is reviewed by clearly erroneous standard). *See also Steele v. Hartford Fire Insurance Co.*, 788 F.2d 441, 445 (7th Cir.1986) (noting that questions of application of the law to facts have been reviewed under different standards).

Nonetheless, cases addressing the economic substance of a transaction for tax purposes have been given deferential review. *See Yosha v. Commissioner*, 861 F.2d 494, 499 (7th Cir.1988); *Levin v. Commissioner*, 832 F.2d 403, 405 (7th Cir.1987). The clearly erroneous standard has also been applied to other questions involving the characterization of facts for tax purposes. *See*, for example, *Heffley v. Commissioner*, 884 F.2d 279, 282 (7th Cir.1989) (whether property put to "qualified use"); *Wright v. United States*, 809 F.2d 425, 428 (7th Cir.1987) (whether the taxpayer "willfully" failed to pay withholding taxes).

Despite what may appear to be an inconsistency with *Frank Lyon*, the dispute here, which centers on the consequences and realities of the inventory transfers, seems to raise predominately factual questions. *Cf. Casebeer v. Commissioner*, 909 F.2d 1360, 1362 n. 6 (9th Cir.1990) (noting *Frank Lyon*, but reviewing determination of whether transactions were shams under clear error standard). *But cf. Newman v. Commissioner*, 902 F.2d 159, 162 (2d Cir. 1990) (reviewing de novo Tax Court's determination that an agreement was a lease).

There is no reason to conclude that we are in a better position to weigh the relative significance of specific facts and assess the total character of the realtionship between S.R. Sales and Rexnord than the district court, who as the trier of fact heard the relevant testimony as well as reviewed the documentary evidence. Considerations which favor a de novo standard, such as the desire to create a uniform rule, are not present here since no single rule could embrace the varied fact patterns which may arise in these inventory transactions. *See Mucha v. King*, 792 F.2d 602, 605–6 (7th Cir.1986). In any event, in this case the standard to be applied matters little, since even under de novo review, we would affirm.

■ Rexnord's dealings with S.R. Sales is one approach to solving what the Supreme Court in *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 545, 99 S.Ct. 773, 787–78, 58 L.Ed.2d 785 (1979), called a manufacturer's "unattractive Hobson's choice." Faced with the high cost of retaining obsolete or slow moving inventory, but the possible need for these items sometime in the future, Rexnord was given by S.R. Sales the option of both technically eliminating excess inventory from its books and at the same time keeping it within easy reach. *Thor Power Tool* holds that the Treasury Department need not permit a taxpayer to reap tax benefits by writing off excess inventory as scrap while physically retaining the goods. Following *Thor Power Tool*, a trilogy of cases, the so-called "SAJAC" cases, confronted a new angle. *See Paccar Inc. v. Commissioner*, 85 T.C. 754 (1985), *aff'd*, 849 F.2d 393 (9th Cir. 1988); *Clark Equipment Company v. Commissioner*, 55 T.C.M. 389 (1988); *Robert Bosch Corp. v. Commissioner*, 58 T.C.M. 921 (1989). SAJAC, a warehousing company, would "buy" and hold inventory which would remain readily available to the original supplier, which in turn claimed an inventory loss on its tax returns.

The IRS disallowed these deductions and the taxpayers petitioned for review. All three cases found that while these arrangements were arms length transactions they did not amount to true sales because, in essence, the manufacturer retained control over its merchandise. In *Paccar* and *Clark*, SAJAC was required to hold a manufacturer's merchandise for a specified period unless it obtained the original supplier's consent. In *Robert Bosch*, there was no written contract which restricted SAJAC's ability to sell to third parties but, as in the earlier cases, SAJAC represented that it would hold merchandise. The court determined that, given the economic reality of the relationship, "[t]he heart of the SAJAC concept" was holding goods for Bosch. 58 T.C.M. at 931.

S.R. Sales played a slightly different variation on this old theme. In its agreements with Rexnord, it expressly retained the right to sell to third parties. But S.R. Sales had little incentive actually to offer Rexnord's goods widely to the general market because it was specialized merchandise which others would generally not be able to use and would only want to purchase at the scrap price. Buying Rexnord's goods at scrap prices to resell later at or near the going scrap price does not make for an attractive business venture. The "heart" of S.R. Sales' business is holding goods to later be repurchased by the seller. S.R. Sales did not purchase Rexnord's inventory for immediate resale. An inter-office memorandum written by Rexnord's controller regarding the company's inventory obsolescence policy includes a reference to S.R. Sales as a corporation which purchases and "holds" surplus inventory. No formal or informal understandings that S.R. Sales would in fact hold the merchandise were necessary—the only reason Rexnord dealt with S.R. Sales instead of immediately scrapping excess inventory was because it had continuing access to its merchandise.

Although these transactions had the trappings of a "bona fide sale," the economic reality was quite different. S.R. Sales sold a small percentage of the inventory it acquired from Rexnord. Rexnord points to instances when S.R. Sales sold Rexnord products to third parties noting these sales accounted for 63 percent of the total Rexnord goods resold, when measured by weight—which included sales to

scrap dealers. However, when measured by dollar value, 95 percent of the resold inventory was sold back to Rexnord. We agree with the district court that these figures reveal S.R. Sales' only profitable course was to buy and hold goods to offer back to Rexnord—not the usual position of a true buyer. At oral argument, Rexnord's attorney characterized the district court's holding as creating a bright line rule that if a buyer's best customer is the original seller there cannot be a true sale. But in S.R. Sales' business, Rexnord was not just the best customer of its own merchandise, it had no close rivals.

Rexnord contends that we should rely on the language of the agreements which gave S.R. Sales formal control over its purchases from Rexnord and not on the facts. Rexnord's claim, however, requires us to apply the oft-quoted "doctrine of substance over form." *Frank Lyon*, 435 U.S. at 573, 98 S.Ct. at 1298. The form here includes S.R. Sales' possession and ownership of the merchandise and its assumption of risk—the benefits and burdens which are traditional indicia of a true sale. But in practice, while one contract stated that the merchandise transferred would be mutually agreed upon, in its dealings with all Rexnord entities S.R. Sales exercised little discretion over what obsolete and slow moving merchandise it would receive—Rexnord essentially dumped merchandise when and if it chose to do so.

■ The fact that S.R. Sales could theoretically sell to anybody at its discretion, and occasionally did, doesn't end our inquiry. The character of S.R. Sales' relationship with Rexnord in fact had no logical business basis but for S.R. Sales to hold goods for Rexnord and resell them to it. Why else did S.R. Sales store inventory with Rexnord's inventory identifying numbers? Although there were apparently a few instances when Rexnord could not repurchase its inventory from S.R. Sales, the record does not clearly reflect the cause of the missing inventory, which could have been lost or scrapped by S.R. Sales or may never have been received from Rexnord. The record does show that while S.R. Sales

made attempts to advertise to the general market these efforts were unsuccessful in generating sales. There was also evidence that S.R. Sales discontinued doing business with manufacturers that did not make sufficient repurchases. Isolated instances of sales to third parties do not render the transactions between Rexnord and S.R. Sales bona fide sales which permit a tax deduction. The substance of the transfers was that as a practical matter, Rexnord retained effective control over its inventory.

Cases cited by Rexnord finding sales for tax purposes in other contexts where a transaction included an agreement to repurchase or resell do not suggest a different conclusion. A few examples will suffice. Rexnord points to the Supreme Court's holding in *Frank Lyon, supra*. In *Frank Lyon*, Worthen Bank sold a building it was constructing to the taxpayer, Frank Lyon Company, which in turn entered into a long-term lease with the bank. The bank was given an option to repurchase the building. The Court found that this transaction was a sale and not merely a loan for tax purposes. The Court relied on several factors not present here, in particular the fact that the sale-leaseback arrangement was entered into due to restrictions imposed on the bank by regulatory authorities. The district court had also found that Worthen was unlikely ever to exercise its option to buy the building, while, by contrast, Rexnord's primary purpose in dealing with S.R. Sales was to have S.R. Sales retain its merchandise for Rexnord's future repurchase.

Cases involving returnable containers are similarly distinguishable. *See*, for example, *LaSalle Cement Co. v. Commissioner*, 59 F.2d 361 (7th Cir.1932), *cert. denied*, 287 U.S. 624, 53 S.Ct. 79, 77 L.Ed. 542 (1932); *Knobel v. Commissioner*, 13 T.C.M. 680 (1954). In those cases not only was the form of the transaction—the express transfer of title—found to be controlling, but the crux of those arrangements was to sell the contents of the containers, not to transfer the containers to be held for repurchase. Rexnord also argues that cases where a purchaser had a buy-back

guarantee show that true sales have been found even where buyers had a much lower risk of loss than S.R. Sales. S.R. Sales' incidents of ownership, however, do not themselves determine the substance of its transactions with Rexnord.

■ Rexnord's reliance on the language of applicable treasury regulations is also misplaced. Treasury Regulation Section 1.471–1 (1954 Code) states in pertinent part that merchandise "should be included in the inventory only if title thereto is vested in the taxpayer.... [g]oods sold ... title to which has passed to the purchaser" should be excluded. From this Rexnord argues that since S.R. Sales was given legal title to merchandise it acquired from Rexnord, these items should have been excluded from its ending inventory. Not so—only items which were, in true substance, "sold" may properly be omitted. *See Paccar*, 849 F.2d at 397. The fact that S.R. Sales technically owned the goods which it acquired from Rexnord, since by contract it obtained formal title to them, does not determine whether there has been a bona fide sale for tax purposes. *Frank Lyon*, 435 U.S. at 573, 98 S.Ct. at 1298. Note too, contrary to suggestions by Rexnord of government inconsistency, previous audits allowing deductions for these transfers did not prohibit the IRS from later reversing itself. *See Knights of Columbus Council No. 3660 v. United States*, 783 F.2d 69, 73 (7th Cir. 1986).

■ Moreover, the genuine non-tax reasons for transferring merchandise to S.R. Sales which Rexnord underscores do not weigh in favor of permitting Rexnord to obtain a tax deduction (although if Rexnord was looking only for a tax break that might make our task easier). Presumably the manufacturers in the SAJAC cases all had objectives beyond simply tax avoidance. These benefits will remain regardless of our disposition of this case—our only question is whether the treasury department must provide a tax deduction to add to these advantages. Rexnord's good faith motivations do not alter the fact that it has attempted to decrease its taxable income by physically removing its inventory while not losing the opportunity to reacquire and use or resell the same inventory at will.

Rexnord and S.R. Sales have not entered into a traditional buyer and seller relationship. Rexnord did not intend finally to sever its ties to its inventory—it prearranged for its potential repurchase. S.R. Sales' primary role and the only profitable one vis-a-vis Rexnord was to hold Rexnord's merchandise to offer it back again at a higher price. This arrangement, while making perfect business sense, does not entitle Rexnord to a government tax subsidy.

AFFIRMED.