UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-1080
(2:95-cv-00571-WO)

VOLVO CARS OF NORTH AMERICA, LLC; VOLVO GROUP NORTH
AMERICA, INCORPORATED,

             Plaintiffs - Appellants,

         v.

UNITED STATES OF AMERICA,

             Defendant – Appellee.

O R D E R

The court amends its opinion filed July 9, 2009, as
follows:

On the cover sheet, district court information section --
the name of "William L. Osteen, Jr., District Judge" is deleted
and is replaced by "William L. Osteen, Sr., Senior District
Judge."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

VOLVO CARS OF NORTH AMERICA,
LLC; VOLVO GROUP NORTH
AMERICA, INCORPORATED,

          *Plaintiffs-Appellants,*

        v.

UNITED STATES OF AMERICA,

          *Defendant-Appellee.*

No. 08-1080

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
William L. Osteen, Sr., Senior District Judge.
(2:95-cv-00571-WO)

Argued: March 26, 2009

Decided: July 9, 2009

Before NIEMEYER and MICHAEL, Circuit Judges, and
Eugene E. SILER, Jr., Senior Circuit Judge of the United
States Court of Appeals for the Sixth Circuit,
sitting by designation.

Vacated and remanded with instructions by published opinion. Judge Niemeyer wrote the opinion, in which Judge
Michael and Senior Judge Siler joined.

**COUNSEL**

**ARGUED:** Charles Alan Rothfeld, MAYER BROWN, LLP, Washington, D.C., for Appellants. Bridget Maria Rowan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Charles P. Hurley, Nicole Reuling, Golaleh Kazemi, MAYER BROWN, LLP, Washington, D.C., for Appellants. Nathan J. Hochman, Assistant Attorney General, Jonathan S. Cohen, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Anna Mills Wagoner, United States Attorney, Greensboro, North Carolina, for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

In this federal income tax refund case, Volvo Cars of North America, Inc., and its subsidiaries and predecessors (collectively "Volvo"), wrote off excess and slow-moving inventory that it purportedly sold to a warehouser under an April 6, 1983 contract, thus reducing its taxable income for the 1983 tax year. When the IRS asserted that the sales were not bona fide sales, because Volvo retained control over the inventory even after Volvo transferred the inventory, Volvo paid the taxes avoided by the write-off and commenced this action against the United States for a refund.

The jury returned a verdict in Volvo's favor, finding that the purported sales to the warehouser — both before and after execution of the April 6, 1983 contract — were indeed bona fide sales, thereby entitling Volvo to a tax refund in the 1983 tax year in the amount of $2.8 million, plus interest. The district court, however, entered a judgment notwithstanding the verdict in favor of the government with respect to transfers of inventory made *prior to* execution of the contract, concluding

as a matter of law that the April 6, 1983 contract did not address inventory previously transferred to the warehouser.

Because we conclude that Volvo presented sufficient evidence from which the jury could reasonably have concluded that the April 6, 1983 contract effected a bona fide sale of the previously transferred inventory, we vacate the judgment and remand to the district court for entry of judgment consistent with the jury's verdict.

I

Volvo, a manufacturer of motor vehicles, including trucks, sought to reduce its inventory of slow-moving and excess replacement parts for trucks through an arrangement with a warehouser by which it physically transferred the parts to the warehouser but maintained sufficient control over them to purchase them back when needed by customers, and at the same time it sought to create the conditions for a tax write-off that was available for sales of inventory.[1]

To accomplish its purposes, Volvo initially entered into an April 18, 1980 contract (the "1980 Contract") with Sajac Company, Inc., a warehouser which described itself as an "inventory management specialist" that was "in the business of purchasing and holding for resale the excess parts inventories

---

[1]For a manufacturing business, "gross income" for tax purposes means the total sales, less cost of goods sold. 26 C.F.R. § 1.61-3. The cost of goods sold is determined by subtracting the year-end inventory from the total inventory available during the year, so that the taxpayer excludes goods that have been sold from ending inventory. 26 C.F.R. § 1.471-1. Reducing the year-end inventory thus increases the cost of goods sold and correspondingly reduces income. Thus, a manufacturer that expends money to manufacture or purchase spare parts may not deduct the expense as long as the parts remain unsold in inventory. Even selling spare parts for scrap prices is more attractive to a manufacturer from a tax perspective than continuing to hold parts in inventory unsold. *See Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 545-46 (1979).

of various manufacturers." Manufacturers would transfer their excess parts to Sajac for scrap prices, and Sajac would then store the parts for as long as 10 to 15 years in its own high-density, computerized warehouses. If the manufacturer had a need for a part later, the manufacturer would be able to repurchase it from Sajac at a price well above scrap price but well below the cost of manufacturing or buying the part. Volvo and Sajac believed that this arrangement would allow Volvo to claim a tax write-off for the inventory so transferred to Sajac, while also providing the parties with mutual economic benefits.

The terms of the 1980 Contract with Sajac passed "[a]ll right, title and interest" in the excess inventory to Sajac, but they also provided for Volvo to retain a number of important aspects of control over the inventory, including the right to repurchase it at 90% of standard cost. In the 1980 Contract, Sajac also promised to notify Volvo prior to any planned disposition of Volvo parts inventory to third parties, giving Volvo an opportunity to repurchase that inventory before Sajac sold it to others. Finally, the 1980 Contract allowed either party to cancel the arrangement unilaterally, upon 60 days written notice.

Because of the control that manufacturers such as Volvo retained over inventory transferred under contracts with Sajac, such as the 1980 Contract, the IRS began to challenge the manufacturers' write-offs, asserting that the transfers of inventory to Sajac were not "bona fide arms-length sales for federal income tax purposes." Rev. Rul. 83-59, 1983-1 C.B. 103. Rather, the IRS asserted that such an arrangement was "in substance . . . merely . . . a warehousing and inventory management service arrangement." *Id.* The Tax Court sustained the IRS' position in *Paccar, Inc. v. Commissioner*, 85 T.C. 754 (1985), *aff'd*, 849 F.2d 393 (9th Cir. 1988), and the parties here agree that *Paccar* now provides the standard for

determining whether transfers of inventory are bona fide sales for federal income tax purposes.[2]

In response to the threat of an IRS challenge to the write-offs, Volvo and Sajac entered into a new contract on April 6, 1983 (the "1983 Contract"). But unlike the 1980 Contract, the 1983 Contract eliminated the provisions that the IRS had identified as indicating that the sales were not bona fide sales. At its core, it specified, "the Sajac Company, Inc. ('Sajac') agrees to purchase and the undersigned Seller [i.e., Volvo] agrees to sell, certain of Sellers' inventory." This contract did not give Volvo the same rights of control over the inventory that the 1980 Contract did. In particular, it did not require Sajac to notify Volvo before Sajac sold the inventory to third persons.

The IRS nonetheless challenged all of Volvo's inventory transfers to Sajac between 1981 and 1990 — whether under the 1980 Contract or the 1983 Contract — on the basis that they were not bona fide sales. Volvo conceded, in light of *Paccar*, that the transfers under the 1980 Contract were not bona fide sales inasmuch as the 1980 Contract was very similar to the contract in *Paccar*. *See* 85 T.C. at 756-57. Accordingly, Volvo settled the IRS' claims for tax years 1981 and 1982, for which only the 1980 Contract governed the Volvo-Sajac relationship. But Volvo maintained that all sales under the 1983 Contract were bona fide sales, and further that the 1983 Contract replaced the 1980 Contract, thus effecting a bona fide sale on April 6, 1983, of the inventory that had been previously transferred to Sajac.

---

[2]In *Paccar*, the Tax Court set out four factors to consider in determining whether transfers of inventory to Sajac are bona fide sales: "(1) Who determined what items were taken into inventory; (2) who determined when to scrap existing inventory; (3) who determined when to sell inventory; and (4) who decided whether to alter inventory." 85 T.C. at 779. *See also Rexnord, Inc. v. United States*, 940 F.2d 1094 (7th Cir. 1991); *Robert Bosch Corp. v. Commissioner*, 58 T.C.M. (CCH) 921 (1989); *Clark Equip. Co. v. Commissioner*, 55 T.C.M (CCH) 389 (1988).

After the IRS disallowed all of Volvo's write-offs for transfers to Sajac, Volvo paid the taxes that would have been due if the IRS's position were correct and commenced this action for a refund. Volvo's complaint claimed refunds for tax years 1983, 1985, 1986, 1987, and 1989, resulting from the IRS' allegedly improper rejection of the write-offs. Specifically, for the tax year 1983, which is the only tax year at issue in this appeal, Volvo alleged that the IRS' position improperly increased its income in the amount of $6,101,960, for which it was entitled to a tax refund of $2,807,902, plus interest.

The case was tried to a jury, which heard testimony from Volvo employees and former Sajac employees about the course of the Volvo-Sajac relationship. The evidence was offered to show that once Volvo transferred the parts, both its conduct and Sajac's conduct were consistent with completed bona fide sales under the *Paccar* factors. *See* 85 T.C. at 779. These witnesses testified that when Sajac went out of business in 1991, it sold all of its Volvo parts inventory to Lippert Enterprises, an unrelated third party, without providing any notice of the sale to Volvo until after the sale had been completed; that even before its 1991 liquidation, Sajac sold Volvo inventory to third parties "on a daily basis" without "ever go[-ing] and ask[ing] anybody at Volvo for permission or approval"; and that Sajac would often scrap or alter inventory without Volvo's permission or knowledge.

To aid in resolving the parties' various contentions about the function of the 1983 Contract, the district court submitted two questions to the jury. The first question required the jury to determine whether the inventory physically transferred *before* the 1983 Contract's execution on April 6, 1983, was the subject of a bona fide sale in 1983, as Volvo alleged in its complaint. The second question required the jury to determine whether the inventory transfers *after* April 6, 1983, were bona fide sales. The court also instructed the jury on the four relevant factors set forth in *Paccar*, 85 T.C. at 779.

The jury returned a verdict in favor of Volvo, finding that the transfers both before and after the execution date of the 1983 Contract were the subject of bona fide sales for federal tax purposes. The government then filed a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), contending that Volvo had presented insufficient evidence for a reasonable jury to find that any of the transfers were bona fide sales. The district court denied the motion regarding the inventory transferred *after* April 6, 1983, stating:

> Viewing the conflicting evidence in a light most favorable to Volvo, the court finds that there is a legally sufficient basis upon which a reasonable jury could conclude that Sajac exercised control of its Volvo inventory, and, moreover, did not hold the inventory pending repurchase by Volvo. As instructed by the court, the jury applied the [*Paccar*] multiple factor test to the conflicting evidence before it and determined that Volvo's transfers of inventory to Sajac were bona fide sales of inventory for tax purposes.

But regarding the inventory transferred *before* April 6, 1983, the court granted the government's motion, concluding, as a matter of law, that this inventory was not addressed by the 1983 Contract and was covered only by the 1980 Contract, which Volvo concedes did not effect bona fide sales.

From the district court's judgment in favor of the government regarding inventory transferred *before* April 6, 1983, Volvo filed this appeal.

II

Volvo's principal reason for entering into the 1980 Contract with Sajac was to obtain a write-off for the sale of slow-moving and excess inventory, although it also sought to

reduce inventory and the costs associated with storing and managing it. The parties agree, however, that in order to obtain a tax write-off for the sale of inventory, the sale must be a completed bona fide sale that relinquishes control over the inventory. *See Paccar*, 85 T.C. at 781. The parties also agree that the 1980 Contract did not satisfy the criteria for a completed bona fide sale, as articulated in *Paccar*, 85 T.C. at 779, because Volvo retained too much control over the inventory even after it physically transferred the inventory to Sajac.

In response to the threat of an IRS challenge to the inventory write-offs, Volvo and Sajac entered into the 1983 Contract, which eliminated the fatal terms that gave Volvo control over inventory in the 1980 Contract, and the parties agree that transfers of inventory under the 1983 Contract satisfied the *Paccar* standards, as the jury found. The district court concluded that sufficient evidence supported the jury's finding in that regard, and the government has not appealed that finding.

The sole issue on appeal is whether the 1983 Contract effected a sale of the inventory that had been *previously* transferred to Sajac under the 1980 Contract. Posited otherwise, if the inventory transferred to Sajac under the 1980 Contract was not the subject of bona fide sales to Sajac but rather were made under what amounted to a warehousing arrangement, as the government contended, did the 1983 Contract effect a sale of that previously transferred inventory? The resolution of this question turns on whether the 1983 Contract addressed the earlier transferred inventory such that the 1983 Contract replaced the 1980 Contract or whether the 1983 Contract was a new, separate contract operating in parallel with the 1980 Contract, each covering different inventory. The parties acknowledge that if the 1983 Contract replaced the 1980 Contract, Volvo is entitled to the tax write-off from the sale of inventory previously transferred to Sajac.

In determining whether the language of the 1983 Contract covers inventory previously transferred to Sajac, we look to

state law because "in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property." *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 722 (1985) (quoting *Aquilino v. United States*, 363 U.S. 509, 513 (1960)) (internal quotation marks and alteration omitted). But "[o]nce it has been determined that state law creates sufficient interests in the taxpayer to satisfy the requirements of [the Tax Code], state law is inoperative, and the tax consequences thenceforth are dictated by federal law." *Id.* (quoting *United States v. Bess*, 357 U.S. 51, 56-57 (1958)) (internal quotation marks and alteration omitted). In the present appeal, the parties do not dispute that the 1983 Contract resulted in a bona fide sale for purposes of federal tax law. Rather, this case turns on the question of state law, whether the 1983 Contract addressed the previously transferred inventory.

Volvo contends that the commercial context, as well as the parties' mutually accepted course of performance, points to the conclusion that the 1983 Contract *replaced* the 1980 Contract and thus covered not only inventory to be transferred after execution of the 1983 Contract but also inventory that had been transferred to Sajac under the 1980 Contract and was still in Sajac's warehouses or had been purchased from Sajac by third parties.

The government, relying on particular language in the 1983 Contract, argues that the 1983 Contract was forward-looking and did not cover inventory previously transferred to Sajac. It also argues that because no party invoked the cancellation clause in the 1980 Contract, that contract remained in place even as the 1983 Contract was executed. Thus, according to the government, the 1983 Contract was a new and separate contract operating in parallel with the 1980 Contract, each covering different inventory.

We begin with the language of the 1983 Contract. The controlling language is in its first sentence, which states, "Subject

to the terms and conditions below, The Sajac Company, Inc. ('Sajac') agrees to purchase and [Volvo] agrees to sell, *certain of [Volvo's] inventory*." (Emphasis added). This sentence defines the full operation of the 1983 Contract, yet the contract does not contain any other language defining what is included in "certain inventory."

The government, nonetheless, argues that the earlier transferred inventory could not have been encompassed by the "certain inventory" sold in the 1983 Contract because the 1983 Contract uses future tenses regarding the details of transportation and payment arrangements. These uses of the future tense, however, do not restrict the scope of or define that "certain inventory" which was sold to Sajac in the first sentence of the contract. These future-tense terms simply govern the details of transportation and payment for inventory that had not yet been transferred but would be transferred after the execution of the contract.

Wisconsin law, which, by the terms of the 1983 Contract, governs, provides the appropriate means of defining "certain inventory." The Wisconsin codification of the Uniform Commercial Code states:

> Terms . . . which are . . . set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein . . . *may be explained or supplemented*:
>
> (1) . . . *by course of performance*.

Wis. Stat. § 402.202 (emphasis added). The official comment on this section explains the importance of § 402.202's operation:

> This section definitely rejects:
>
> * * *

(b) The premise that the language used has the meaning attributable to such language by rules of construction existing in the law rather than *the meaning which arises out of the commercial context in which it was used*; and

(c) The requirement that a condition precedent to the admissibility of the type of evidence specified in paragraph (a) [*i.e.*, course of performance] is an original determination by the court that the language used is ambiguous.

*Id.* cmt. 1 (emphasis added). Thus, we are not to rely solely on canons of contract interpretation, such as verb tenses, in interpreting the scope of the term "certain inventory," but we must also consider the "course of performance" and "commercial context" of the provision. Moreover, we need not determine whether the contract is ambiguous before considering evidence of course of performance. *See also* Wis. Stat. § 402.208(1).

While we thus look to state law to determine the nature of the interest that Volvo has in the previously transferred inventory, *see Nat'l Bank of Commerce*, 472 U.S. at 722, we look to federal law for the tax consequences of that interest. But even in applying federal law to determine the tax consequences of a transaction defined by state law, we look to "the intention of the parties as evidenced by the written agreements *read in light of the attendant facts and circumstances*." *Paccar*, 85 T.C. at 777 (emphasis added). Similarly, we have long held that the parties' intent and the relevant facts are crucial in construing contracts for federal tax purposes. *See Gen. Ins. Agency, Inc. v. Commissioner*, 401 F.2d 324, 329-30 (4th Cir. 1968).

Thus, in the present case, evidence of "course of performance" and "commercial context" may be considered in

determining what "certain inventory" in the 1983 Contract means. That evidence shows the following.

*First*, the reason for entering into the 1983 Contract was to reformulate the 1980 Contract so as to eliminate the provisions identified by the IRS as precluding tax write-offs for inventory sales to Sajac. As the district court noted, in the 1983 Contract, "Sajac modified its standard contract with manufacturers as the result of several Tax Court decisions finding that no bona fide sales had occurred under terms virtually identical to those of the [1980 Contract]." Moreover, a Volvo employee testified at trial that in response to "a tax case," *i.e.*, *Paccar*, involving Sajac and "one of their other customers, . . . the management of our company [Volvo] and Sajac sat down and looked at things, . . . and we rewrote [the] contract at that point."

*Second*, both the 1980 Contract and the 1983 Contract addressed the same subject matter, sales of slow-moving and excess inventory to Sajac for the mutual benefit of the parties and for a tax write-off for Volvo. There was no evidence that the parties intended to divide the inventory for different treatments, and there was no purpose for the 1983 Contract other than to strengthen the argument for the tax write-offs.

*Third*, the method by which Sajac maintained *all* Volvo excess parts inventory remained the same. There was no evidence showing that after execution of the 1983 Contract, Sajac distinguished in any respect its treatment of inventory transferred under the 1980 Contract or that it was even aware of a need or desire to make a distinction. Indeed, the evidence was uncontroverted that Sajac did not change its conduct with respect to Volvo inventory after execution of the 1983 Contract. Sajac did nothing to segregate or differentiate the previously transferred inventory from the inventory transferred after execution of the 1983 Contract. Had the parties believed that they were operating under two separate contracts, Sajac would certainly have distinguished the inventories because

Volvo had significantly more rights and control in inventory transferred under the 1980 Contract than in inventory transferred under the 1983 Contract. Moreover, maintaining two categories of Volvo inventory for replacement parts would have been a legal and logistical nightmare, with Sajac segregating the inventory in its warehouses to comply with two separate legal regimes. Volvo presented extensive evidence tending to show that the segregation requisite to the government's position never took place.

*Fourth*, when Sajac went out of business in 1991, it sold *all* of its Volvo inventory—both pre-1983 Contract and post-1983 Contract inventory—to Lippert Enterprises without providing any notice whatsoever to Volvo. Several witnesses testified that Volvo learned of the sale only well after it was completed. Yet, the 1980 Contract expressly required Sajac to give advance notice to Volvo of any planned disposition, while the 1983 Contract lacked any such provision. If, as the government contends, the 1980 Contract remained in force for inventory transferred prior to the 1983 Contract's execution, then Sajac would have been required to give advance notice. But it did not, giving rise to a strong inference that the 1983 Contract governed *all* Volvo inventory.

This evidence relating to course of performance and commercial context could well have been taken by the jury to define the term "certain inventory" in the 1983 Contract, and thus this evidence provides support for the jury's rejection of the government's proposed interpretation of "certain inventory."

The government relies heavily on the fact that neither party cancelled the 1980 Contract pursuant to its cancellation clause. Because of that, it maintains, the 1980 Contract must have continued to govern the inventory that had been transferred to Sajac before execution of the 1983 Contract. The 1980 Contract provided that "This AGREEMENT shall continue in force and effect unless and until cancelled by either

party. Either party may cancel this AGREEMENT upon 60 days written notification of its intent to cancel." This cancellation provision, however, does not provide the only way the 1980 Contract could end. Indeed, the clause only addresses *unilateral* cancellation by a party—how *one* party may end the contractual relationship. Surely, if both parties wished to end the relationship, they could do so by mutual consent, as the evidence in this case suggests they did.

The determination of whether the 1983 Contract replaced the 1980 Contract or operated in parallel with it is a question that involves both legal determinations and factual findings. The jury was properly instructed on the *Paccar* factors and was given the latitude to decide factually whether the 1983 Contract effected a completed bona fide sale of all inventory, including inventory that had been previously transferred to Sajac. Based on the evidence presented, we cannot conclude that the jury acted unreasonably in concluding that the 1983 Contract did effect a bona fide sale of the previously transferred inventory. Because judgment as a matter of law is proper only when "there can be but one reasonable conclusion as to the proper judgment," *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 562 F.3d 295, 305 (4th Cir. 2009) (quoting *Chaudhry v. Gallerizzo*, 174 F.3d 394, 405 (4th Cir. 1999)), the district court erred in setting aside the jury's verdict and entering judgment as a matter of law.

Accordingly, we vacate the judgment of the district court and remand with instructions to enter judgment consistent with the jury's verdict.

*VACATED AND REMANDED WITH INSTRUCTIONS*