**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 11-1804

JOSEPH B. WILLIAMS, III,

Petitioner - Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee.

Appeal from the United States Tax Court. (Tax Ct. No. 2202-08)

Argued: September 19, 2012          Decided: December 4, 2012

Before WILKINSON and THACKER, Circuit Judges, and Michael F. URBANSKI, United States District Judge for the Western District of Virginia, sitting by designation.

Affirmed by unpublished opinion. Judge Urbanski wrote the opinion, in which Judge Wilkinson and Judge Thacker joined.

**ARGUED:** David Harold Dickieson, SCHERTLER & ONORATO, LLP, Washington, D.C., for Appellant. Damon William Taaffe, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Pamela Satterfield, SCHERTLER & ONORATO, LLP, Washington, D.C., for Appellant. **ON BRIEF:** Tamara W. Ashford, Deputy Assistant Attorney General, Robert W. Metzler, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit.

URBANSKI, District Judge:

Joseph B. Williams, III, challenges the notice of tax deficiency issued to him by the Commissioner of Internal Revenue for tax years 1993 through 2000. The Tax Court upheld the Commissioner's notice of deficiency. Williams now appeals.

Williams argues that the Tax Court erred in three ways: (1) by holding Williams' guilty plea to criminal tax evasion collaterally estops him from denying liability for civil fraud penalties for tax years 1993 through 2000; (2) by attributing income generated by Williams' consulting services to Williams individually instead of to the foreign corporation he formed; and (3) by disallowing certain charitable deductions taken by Williams for art donations made to two universities over the course of three years. Finding each of Williams' arguments to be without merit, we affirm.

I.

A.

Williams worked for Mobil Oil Corporation from 1973 until his retirement in 1998. In the 1990s, he was tasked with developing strategic business relationships in Russia and former Soviet republics. In 1993, separate and apart from his work with Mobil, Williams began providing consulting and other services concerning pipeline-related contracts to foreign

2

governments. Alika Smekhova, a Russian actress and celebrity, arranged introductions and provided interpretation services for Williams in connection with his consulting work. That same year, Williams formed ALQI Holdings, Inc. ("ALQI"), a British Virgin Islands corporation. Williams was the sole owner, operational director, and officer of ALQI. Neither Williams nor Smekhova had a written employment contract with ALQI.

Two accounts were opened in ALQI's name at a Swiss bank, Banque Indosuez ("the ALQI accounts"). Williams had complete authority over the ALQI accounts. The bank provided Williams with use of its office space, as well as a Swiss mobile telephone and credit card that were issued and billed in Williams' name. All monies deposited into the ALQI accounts between 1993 and 2000 were received for Williams' oil and pipeline-related consulting services. There are no consulting agreements documenting the services rendered. Williams did not use the ALQI name in his dealings with third parties and did not maintain corporate accounting records.

Smekhova was paid a stipend of $5,000 to $10,000 per month from the ALQI accounts, but Williams did not pay himself a salary or commission. Funds were transferred from the ALQI accounts at Williams' direction, however, and were used to pay credit cards and other bills reflecting Williams' personal expenses, such as a $30,000 shopping spree in Paris and a family

3

ski vacation.  Williams also made gifts to family and friends from these accounts, including over $41,000 in payments to his former secretary and a $15,000 gift to the wife of Williams' deceased father.

More than $7 million in consulting fees were deposited into the Swiss accounts during the relevant period and over $1.1 million in interest, dividends and capital gains was earned on these deposits.  Williams did not report any of the consulting fee or investment income on his individual tax returns for tax years 1993 through 2000, nor did he disclose the existence of ALQI or its Swiss accounts.

In 2000, at the request of the United States government, the Swiss government froze the ALQI accounts.  Subsequently, Williams disclosed his ownership interest in ALQI and the existence of the ALQI accounts on his 2001 tax return.[1]  In 2003, Williams amended his 1999 and 2000 tax returns[2] to report the investment income earned on the funds in the ALQI accounts, and he paid the additional tax due.  Williams did not include as

---

[1] Earlier this year we determined that Williams willfully violated 31 U.S.C. § 5314(a) by failing to file for tax year 2000 the form TD F 90-22.1 ("FBAR"), on which he was required to disclose his interest in the ALQI accounts.  United States v. Williams, No. 10-2230, 2012 WL 2948569 (4th Cir. July 20, 2012).

[2] Amended returns for 1993 through 1998 were prepared but were never filed.

4

income on either his original or amended returns the corpus of the accounts.

In 2003, Williams was charged in a two-count superseding criminal information with conspiracy to defraud the government, in violation of 18 U.S.C. § 371, and tax evasion, in violation of 18 U.S.C. § 7201. On June 12, 2003, Williams entered a guilty plea to both counts. The court accepted the guilty plea, sentenced Williams to 46 months' incarceration, and ordered him to pay $3,512,000 in restitution. Williams was released from federal custody on May 21, 2006.

B.

In 1996, Williams signed an Art Purchase Agreement in which he purportedly committed to purchasing at a discount from Abbey Art Consultants, Inc. ("Abbey Art") certain works of art that, at Williams' direction, were to be donated at fair market value to charitable institutions. The Agreement recited that Williams "desire[d] to purchase" $72,000 worth of art, but did not identify specific pieces of art, and provided that the purchase price would not exceed 24% of the appraised fair market value of the art. The Agreement required Williams to pay only $3,600 upon signing; the balance of the purchase price was to be paid on or before such time as the art was donated to charity.

Abbey Art was to facilitate all aspects of the art donation and incur all expense, including paperwork, appraisal,

5

packaging, shipping, and storage costs. The Agreement provided that Abbey Art would arrange for the donation "after the required holding period of one (1) year." While Williams could request a donation be made to a certain charitable institution, Abbey Art ultimately had the discretion to choose the donee. If Abbey Art was unable to facilitate the art donation for any reason, the Agreement required Abbey Art to refund Williams' payments. Additionally, Abbey Art's sole remedy under the Agreement for Williams' non-payment was to retain payments already received and retake possession of the art.[3] In the event of a reduction in the fair market value of the art, Abbey Art agreed to pay Williams an amount equal to "the percentage of the dollars paid for each dollar the fair market value of the Art has been reduced." Finally, the Agreement provided that it was the entire agreement between the parties and that it was to be interpreted under New York law.

In December 1997, Abbey Art, at Williams' direction, donated certain pieces of art with an appraised fair market value of $425,625 to Drexel University. Williams received an invoice from Abbey Art in the amount of $98,400, representing a purchase

---

[3] A term of the Agreement requiring specific performance of the unpaid portion of the purchase price was crossed out and initialed by Williams and his wife who, while a signatory to this Agreement, is not a party to this case.

price of $102,000 (approximately 24% of the appraised fair market value of the art) less Williams' $3,600 deposit. Williams paid Abbey Art $98,400 before the end of 1997 and on his federal income tax return for that year, Williams claimed a charitable contribution deduction of $425,625.

In December 1999, Williams wrote Abbey Art requesting that a gift of art be made on his behalf to Florida International University for the current tax year. Williams enclosed with this letter a check in the amount of $57,500. Certain pieces of art with an appraised value of $250,525 were donated at Williams' request prior to the end of the year. On his 1999 federal tax return, Williams claimed the full fair market value of the art as a charitable contribution deduction.

In 1999, Williams paid Abbey Art $4,600, and in October 2000, Abbey Art arranged a gift of additional artwork with an appraised value of $98,900 to Drexel University. Williams paid Abbey Art the balance due on this donation, $17,158, on December 8, 2000. Williams again claimed the fair market value of the donated art as a charitable contribution deduction on his 2000 federal income tax return.

C.

On October 29, 2007, the Commissioner of Internal Revenue issued a notice of tax deficiency to Williams. The Commissioner found the consulting fees deposited into the ALQI accounts

7

between 1993 and 2000, as well as the investment income earned on those funds, to be taxable income to Williams and assessed civil fraud penalties for each of the eight years he failed to report this income on his tax returns. The Commissioner also determined that Williams was only entitled to charitable contribution deductions in the amount of his basis in the art donated through Abbey Art, because Williams had not owned the art for at least one year prior to the donations. The Commissioner assessed accuracy-related penalties on the underpayments resulting from the disallowed charitable deductions.

Williams challenged the notice of deficiency by filing a petition in the Tax Court. The Tax Court granted partial summary judgment in favor of the Commissioner, holding Williams was collaterally estopped from denying that he had committed civil tax fraud during each of the years 1993 through 2000. Williams v. Comm'r, No. 2202-08, 2009 WL 1033354 (U.S. Tax Ct. Apr. 16, 2009). Following a bench trial, the Tax Court found that the consulting fee and investment income deposited into the ALQI accounts between 1993 and 2000 was attributable to Williams individually. The Tax Court further held that Williams was not entitled to a charitable contribution deduction in the amount of the fair market value of the donated art because Williams did not hold the art for more than one year before donating it.

8

Accordingly, the Tax Court upheld the Commissioner's notice of deficiency and assessment of civil tax fraud and accuracy-related penalties.  Williams v. Comm'r, No. 2202-08, 2011 WL 1518581 (U.S. Tax Ct. Apr. 21, 2011).  This appeal followed.

We review the Tax Court's decision applying the same standard of review as we would to a civil bench trial in the United States district court.  Waterman v. Comm'r, 176 F.3d 123, 126 (4th Cir. 1999).  Questions of law and statutory interpretation are reviewed de novo and findings of fact for clear error.  Id.  The grant of the Commissioner's motion for partial summary judgment on the collateral estoppel issue is reviewed de novo.  Henson v. Liggett Grp., Inc., 61 F.3d 270, 274 (4th Cir. 1995).  The Commissioner's notice of deficiency is presumed to be correct, and the taxpayer bears the burden of proving it wrong.  McHan v. Comm'r, 558 F.3d 326, 332 (4th Cir. 2009); see also Welch v. Helvering, 290 U.S. 111, 115 (1933).

II.

Williams first argues on appeal that the Tax Court erred in holding that his guilty plea to criminal tax evasion in violation of 18 U.S.C. § 7201 collaterally estops him from

9

denying his liability for civil tax fraud penalties under 26 U.S.C. § 6663 for the years 1993 through 2000.[4]

The doctrine of collateral estoppel applies "where (1) the 'identical issue' (2) was actually litigated (3) and was 'critical and necessary' to a (4) 'final and valid' judgment (5) resulting from a prior proceeding in which the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue."  McHan, 558 F.3d at 331 (quoting Collins v. Pond Creek Mining Co., 468 F.3d 213, 217 (4th Cir. 2006) (citation and quotation marks omitted)).  "[O]nce an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."  Montana v. United States, 440 U.S. 147, 153 (1979).

A taxpayer is collaterally estopped from denying civil tax fraud when convicted for criminal tax evasion under 18 U.S.C. § 7201 for the same taxable year.  Moore v. United States, 360

---

[4] Generally, the Commissioner must assess a deficiency within three years of the filing of the tax return from which the deficiency stems.  26 U.S.C. § 6501(a).  If a deficiency is determined in the case of a false or fraudulent return with the intent to evade tax, however, the Commissioner can assess such a deficiency at any time.  Id. at § 6501(c)(1).  The Commissioner bears the burden of proving civil tax fraud.  26 U.S.C. § 7454(a).

10

F.2d 353, 355 (4th Cir. 1966); DiLeo v. Comm'r, 96 T.C. 858, 885-86 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992); see generally United States v. Wight, 839 F.2d 193, 196 (4th Cir. 1988) ("The doctrine of collateral estoppel may apply to issues litigated in a criminal case which a party seeks to relitigate in a subsequent civil proceeding."). "[W]hile the criminal evasion statute does not explicitly require a finding of fraud, the case-by-case process of construction of the civil and criminal tax provisions has demonstrated that their constituent elements are identical." Moore, 360 F.2d at 356.

## A.

Williams argues that the Tax Court misinterpreted the terms of his guilty plea in barring him from denying civil tax fraud liability for the years 1993 through 2000. Williams contends that he did not plead guilty to tax evasion, but rather to evasion of *payment* of taxes, the elements of which are not dependent upon any specific tax year.[5] As such, Williams argues

_____

[5] Section § 7201 "includes the offense of willfully attempting to evade or defeat the assessment of a tax as well as the offense of willfully attempting to evade or defeat the payment of a tax." Sansone v. United States, 380 U.S. 343, 354 (1965). As the Third Circuit in United States v. McGill, 964 F.2d 222, 230 (1992), explained, the willful filing of a false return satisfies the elements of evasion of assessment. Such cases are far more common than evasion of payment cases, which are rare and generally require an affirmative act that occurs after any filing, such as placing assets in the name of others (Continued)

11

that he is not collaterally estopped from denying civil tax fraud for the entire eight year period set forth in the notice of deficiency, or for any particular year therein.

We reject this argument because, in addition to lacking merit, it has been waived. Williams failed to raise this argument before the Tax Court. Ordinarily, we will not consider an issue raised for the first time on appeal except in limited circumstances, Nat'l Wildlife Fed'n v. Hanson, 859 F.2d 313, 318 (4th Cir. 1988), and this rule is applied equally by courts of appeals reviewing Tax Court decisions, Karpa v. Comm'r, 909 F.2d 784, 788 (4th Cir. 1990) (citing Grauvogel v. Comm'r, 768 F.2d 1087, 1090 (9th Cir. 1985)). Williams has not suggested any reason why we should depart from our ordinary rule in this case, and we see no reason to do so.

B.

Williams also takes issue with the Tax Court's finding that his conviction for tax evasion collaterally estops him from denying civil fraud for each year from 1993 through 2000. Williams disputes that he pled guilty to tax evasion for each and every one of these years. The record, however, proves fatal

_____

or causing debts to be paid through and in the name of others. Id.

12

to this claim.  The plain language of the superseding criminal information charges Williams with tax evasion for each year from 1993 through 2000:

> From in or about 1993, through in or about April 2001, . . . J. BRYAN WILLIAMS, the defendant, unlawfully, willfully and knowingly did attempt to evade and defeat a substantial part of the income tax due and owing by J. BRYAN WILLIAMS . . . for the calendar years 1993 through 2000, by various means, including, among others by (a) arranging for approximately $7.98 million in payments which were income to Williams to be made into the secret Alqi accounts in Switzerland he controlled; and (b) preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed, false and fraudulent U.S. Individual Income Tax Returns, Forms 1040, for the calendar years 1993 through 2000, on which he failed to disclose his interest in the secret Alqi bank accounts in Switzerland, and on which, in the years set forth below, he failed to report the approximate amounts of income set forth below, and upon which income there was a substantial additional tax due and owing to the United States of America:

| Calendar Year | Approximate Amount of Income |
|---|---|
| 1993 | $1,029,518.72 |
| 1994 | $752,479.52 |
| 1995 | $998,723.14 |
| 1996 | $3,917,762.57 |
| 1997 | $1,670,891.49 |
| 1998 | $133,371.90 |
| 1999 | $109,167.59 |
| 2000 | $256,234.64 |

(Title 26, United States Code, Section 7201).

Williams pled guilty to this tax evasion count, as well as to conspiracy to defraud the government in violation of 18 U.S.C. § 371.  Pursuant to a written plea agreement, Williams agreed to

13

"file accurate amended personal tax returns for the calendar years 1993 through 2000" and "pay past taxes due and owing to the [IRS] by him for calendar years 1993 through 2000, including any applicable penalties."

Additionally, Williams admitted during his allocution at his guilty plea hearing that he knew the funds deposited into the ALQI accounts were taxable to him. Williams acknowledged that for "the calendar year tax returns for '93 through 2000, [he] chose not to report the income to [the IRS] in order to evade the substantial taxes owed thereon, until [he] filed [his] 2001 tax return." Williams continued: "I therefore believe that I am guilty of evading the payment of taxes for the tax years 1993 through 2000." As the Tax Court observed, there is no question that Williams pled guilty to and was convicted of tax evasion for each of the eight calendar years 1993 through 2000.

Williams insists he made clear to the district court that he was pleading to a narrower statement of facts concerning tax evasion than those contained in the superseding information. The record proves otherwise. At the plea hearing, Williams' counsel told the district judge:

> [W]e're not adopting or accepting the facts as stated in the conspiracy count, which I think is the recitation of what was in the original indictment in this case. What we have agreed is that Mr. Williams would plead guilty to conspiracy counts, but based

14

upon the factual allocution, which he has given to the Court.

This statement plainly refers to the conspiracy count, not to the tax evasion count. Williams pled guilty to both conspiracy and tax evasion. While he raised a concern at the plea hearing about the factual allegations surrounding the conspiracy count, Williams did not deny any fact or allegation concerning tax evasion, nor raise any issue whatsoever with respect to that count. On the contrary, Williams expressly admitted to facts that demonstrate his tax evasion scheme continued from 1993 until the time he filed his 2001 tax return, as charged in the information.

C.

Williams' final contention with respect to collateral estoppel is that he did not have a full and fair opportunity to litigate the issue previously, because at the time he entered his guilty plea, neither the Commissioner nor Williams had analyzed the actual tax implications arising from the ALQI accounts and the amount of deficiencies for each tax year.[6]

_____

[6] Any suggestion that Williams' conviction following a guilty plea, rather than a trial, renders collateral estoppel inapplicable misses the mark. "[T]here is no difference between a judgment of conviction based upon a guilty plea and a judgment rendered after a trial on the merits," for purposes of applying the doctrine of collateral estoppel, as the conclusive effect is the same. Blohm v. Comm'r, 994 F.2d 1542, 1554 (11th Cir. 1993).
(Continued)

15

Thus, argues Williams, the fraud penalties were not actually and necessarily decided by the court in his criminal case.

Williams confuses the issues. It matters not whether civil fraud penalties and interest had been calculated as of the date of his guilty plea or sentencing.[7] These determinations are not

<hr />

Moreover, Williams' reliance on <u>United States v. International Building Co.</u>, 345 U.S. 502, 505-06 (1953), is misplaced. Williams claims <u>International Building</u> stands for the proposition that collateral estoppel is not appropriate when the decision of a prior court is the result of compromise or negotiation rather than a full review of the facts. But <u>International Building</u> involved "a pro forma acceptance by the Tax Court of an agreement between the parties to settle their controversy for reasons undisclosed." <u>Id.</u> at 505. Indeed, in <u>International Building</u>, the Commissioner agreed to withdraw his proofs of claim for tax deficiencies filed in International Building's bankruptcy proceeding, upon a stipulation that the withdrawal was "'without prejudice' and did not constitute a determination of or prejudice the rights of the United States to any taxes with respect to any year other than those involved in the claim." <u>Id.</u> at 503. The parties filed stipulations in the pending Tax Court proceedings that there was no tax liability for the years 1933, 1938, and 1939, and the Tax Court entered formal decisions to that effect. No factual findings were made, no briefs were filed, and no hearings were held. The Supreme Court held that while the Tax Court's decisions were res judicata with respect to tax claims for 1933, 1938, and 1939, they did not collaterally estop the Commissioner from assessing deficiencies for the years 1943, 1944, and 1945. <u>Id.</u> at 505. <u>International Building</u> is plainly distinguishable from the instant case.

[7] Moreover, the record makes clear it was Williams' counsel who advocated for proceeding with the guilty plea and sentencing hearings before a sum certain in penalties and interest had been calculated. Williams cannot now argue that he was rushed into pleading guilty before a final figure had been determined.

16

required to secure a criminal conviction for tax evasion. What matters for purposes of collateral estoppel is that Williams was indeed convicted of evasion for the years in question. As we held in Moore, that conviction "supplies the basis for a finding of fraud in [a] civil proceeding to determine tax liability." 360 F.2d at 355 (citing Tomlinson v. Lefkowitz, 334 F.2d 262 (5th Cir. 1964)).

Williams pled guilty to a tax evasion scheme that continued from 1993 until 2000. In so doing, Williams admitted that he committed tax fraud in each of those eight years. In light of his guilty plea and allocution, Williams cannot now deny liability for civil tax fraud penalties for the years in question. We find the Tax Court correctly applied the doctrine of collateral estoppel in this case.


III.

Williams next argues that the Tax Court erred in finding him individually liable for tax on the consulting fee income deposited into the ALQI accounts between 1993 and 2000. Williams asserts that ALQI was a legitimate business for which he performed consulting work and contends that he acted on the company's behalf when he earned the consulting fees at issue. We are not persuaded.

17

"The principle that income is taxed to the one who earns it is basic to our system of income taxation." Haag v. Comm'r, 88 T.C. 604, 610 (1987), aff'd, 855 F.2d 855 (8th Cir. 1988) (unpublished table decision); see also Lucas v. Earl, 281 U.S. 111 (1930). For income to be taxable to a corporation: (1) the service-performer must be an employee of the corporation whom the corporation has the right to direct or control in some meaningful sense; and (2) there must exist between the corporation and the person a contract or similar indicium recognizing the corporation's controlling position. Haag, 88 T.C. at 611 (citing Johnson v. Comm'r, 78 T.C. 882, 891 (1982)). No such employer-employee relationship exists here.

Williams testified that he had no written employment agreement and received no regular salary or commission payments from ALQI. He stipulated that he was the sole operational director and officer of ALQI and the only person with authority to act on the company's behalf in its business activities. Williams had exclusive signature authority over the ALQI accounts from 1993 through 2000 and was the sole person from whom Banque Indosuez would accept instructions with respect to those accounts. There is simply no indication that ALQI wielded any form of control over Williams as an employee.

Beyond that, the evidence strongly suggests that Williams did not act on behalf of ALQI when he earned the income in

18

question and merely used ALQI as a bank account. Apart from Williams' testimony, there is no evidence that Williams' consulting clients even knew ALQI existed. There are no consulting agreements, notes or other records that reflect ALQI's business dealings. In fact, there are no ALQI business records at all for the period at issue, except for bank records maintained by Banque Indosuez and a single balance sheet and profit and loss statement dated June 30, 2000. Williams' accountant, Donald Williamson, testified that while he reviewed voluminous bank records and incorporation documents in the course of his work, he did not see any general ledgers, profit and loss statements or balance sheets for ALQI, nor did he see any consulting contracts. Williamson testified that he relied on the representations of Williams and Williams' counsel that ALQI earned the consulting fees in question, and he took those representations at face value.

In an effort to legitimize ALQI's operations, Williams points to ALQI's use of Banque Indosuez's office space, its Swiss cell phone and credit card, as well as the fact that clients deposited consulting fees directly into the ALQI accounts. Williams insists that ALQI employed Smekhova to arrange, attend and translate at meetings conducted for ALQI business, and that ALQI, not Williams, paid her for her services. But Smekhova, like Williams, had no written

19

employment agreement with ALQI.  As the Tax Court noted, "[t]he fact that Mr. Williams' business and personal expenses were paid out of these same Swiss bank accounts does not prove that his clients contracted with ALQI or that ALQI was anything other than the receptacle into which Mr. Williams diverted his consulting income."  Williams, 2011 WL 1518581, at *14.

Williams argues that because ALQI is not a "sham" corporation – and the Tax Court assumed that it is not – it must follow that the consulting fee income is taxable to ALQI.  But Williams' reasoning is flawed.  As the Tax Court persuasively explained, whether ALQI is a legitimate business entity is irrelevant; ALQI simply did not earn the income at issue.[8]  Id.; see Haag, 88 T.C. at 611 ("A finding that the [corporation] is

---

[8] Williams argues Moline Properties, Inc. v. Comm'r, 319 U.S. 436 (1943), supports his position, but his argument falls short.  In that case, petitioner Moline Properties claimed that gain on sales of its real property should be treated, and therefore taxed, as the gain of its sole stockholder, and that its corporate existence should be ignored as fictitious. Notwithstanding the fact that Moline "kept no books and maintained no bank account during its existence," the Supreme Court held that it was a separate entity with a tax identity distinct from its stockholder.  In reaching this conclusion, the Court noted the fact that the stockholder exercised negligible control over the entity, that Moline mortgaged and sold portions of its property, and that Moline entered into its own business venture by leasing part of its property and collecting rental income.  Id. at 440.  On the contrary, in the instant case, Williams exercised exclusive and complete control over ALQI, and there is no evidence that ALQI carried on any business activity apart from serving as Williams' bank account.

20

not a sham does not preclude application of the assignment of income doctrine because a taxpayer can assign income to a corporation with real and substantial businesses to avoid tax liability.").

Moreover, Williams cannot rise above his own admissions at his guilty plea hearing that the "purpose of the [ALQI] accounts was to hold funds and income [he] received from foreign sources during the years 1993 to 2000." Williams further acknowledged that he "knew that most of the funds deposited into the A[LQI] accounts, and all of the interest income were taxable income to [him]," but admitted he "chose not to report the income to the Internal Revenue Service in order to evade the substantial taxes owed thereon."

The Commissioner's determinations of income are entitled to a presumption of correctness, and the taxpayer bears the burden of proving them wrong. McHan v. Comm'r, 558 F.3d 326, 332 (4th Cir. 2009). "The IRS is not given free rein, however: the taxpayer can rebut the presumption of correctness by proving, by a preponderance of the evidence, that the IRS's income determination is arbitrary or erroneous." Id. Williams has not rebutted the presumption in this case. For these reasons, we find that Williams is liable for tax on the corpus of the ALQI

accounts, in addition to the passive income earned on those funds.[9]

## IV.

Williams' final argument on appeal is that the Tax Court erred in limiting his charitable contribution deductions to his basis in the art donated through Abbey Art, rather than allowing deduction of the art's fair market value. Williams contends that the Tax Court erroneously found the Art Purchase Agreement to be an option contract, ignoring both the mutual understanding of the parties and the plain language of the Agreement. For the reasons that follow, we find Williams' arguments unavailing.

## A.

Generally, a deduction is allowed for any charitable contribution for which payment is made within the taxable year. 26 U.S.C. § 170(a)(1). The deduction is allowable, however, only if the contribution is "verified under the regulations prescribed by the Secretary." Id. When a contribution involves property other than money, the amount of the charitable contribution is the fair market value of the property at the

---

[9] Given this holding, we see no reason to address Williams' challenge to the validity of the Controlled Foreign Corporation regulations, as this argument only becomes relevant if the consulting fee income were attributable to ALQI.

22

time the donation is made. 26 C.F.R. § 1.170A-1(c)(1). This rule is modified in situations involving donations of appreciated property. In those circumstances, the amount of any charitable contribution is reduced by the amount of gain that would not have qualified as long-term capital gain if the property had been sold by the taxpayer at its fair market value, determined as of the time of the contribution. 26 U.S.C. § 170(e)(1)(A). In other words, section 170(e)(1)(A) permits the deduction of long-term capital gain appreciation but if the property is not long-term capital gain property, the charitable contribution deduction is limited to the taxpayer's basis at the time of the contribution. Long-term capital gain is defined as gain from the sale or exchange of a capital asset[10] held for more than one year. 26 U.S.C. § 1222(3). The taxpayer bears the burden of proving he is entitled to a charitable deduction in the amount of the fair market value of the donated property. See INDOPCO, Inc. v. Comm'r, 503 U.S. 79, 84 (1992).

B.

The issue to be resolved is whether Williams held the art in question for more than one year before donating it. "In common understanding to hold property is to own it. In order to

---

[10] The art in question qualifies as a capital asset pursuant to 26 U.S.C. § 1221(a).

own or hold one must acquire.  The date of acquisition is, then, that from which to compute the duration of ownership or the length of holding."  McFeely v. Comm'r, 296 U.S. 102, 107 (1935).  Williams argues that he acquired the art when he executed the Art Purchase Agreement in December 1996.  The Commissioner asserts that Williams did not acquire the art until he paid for it, which in each case was within a year of the donation.

In determining the date of acquisition of property:

[N]o hard-and-fast rules of thumb can be used, and no single factor is controlling.  "Ownership of property is not a single indivisible concept but a collection or bundle of rights with respect to the property;" consequently, we must examine the transaction in its entirety.  The date of the passage of legal title is not the sole criteria; the date on which "the benefits and burdens or the incidents of ownership of the property" were passed must also be considered, and the legal consequence of particular contract provisions must be examined in the light of the applicable State law.

Hoven v. Comm'r, 56 T.C. 50, 55 (1971) (internal citations omitted).

The Tax Court did not look to state law in resolving this issue, however, and the Commissioner insists that state law has no applicability here.  Both the Commissioner and the Tax Court cite United States v. Heller, 866 F.2d 1336, 1341 (11th Cir. 1989), for the proposition that "federal tax law disregards transactions lacking an economic purpose which are undertaken

24

only to generate a tax savings. Federal tax law is concerned with the economic substance of the transaction under scrutiny and not the form by which it is masked." Indeed, the Fifth Circuit has recognized that "[t]he application and interpretation of the Internal Revenue Code is a matter of federal law. The form of a document and its effect under state law are therefore not controlling in these federal determinations." Deshotels v. United States, 450 F.2d 961, 964 (5th Cir. 1972). The Fifth Circuit found it appropriate to look to Louisiana law in Deshotels, however, in order to understand the agreement at the heart of the parties' dispute. Id. Williams argues we should do the same here and look to New York law[11] in interpreting the Art Purchase Agreement, and he cites to our decision in Volvo Cars of North America, LLC v. United States, 571 F.3d 373 (4th Cir. 2009), in support of that contention.

In that case, Volvo had written-off excess inventory that it purportedly sold to a warehouser pursuant to the terms of a 1983 contract, thereby reducing its taxable income for the 1983 tax year. The IRS found these were not bona fide sales because Volvo retained control over the inventory even after it was

---

[11] The parties do not dispute that if state law is to be invoked in the context of this analysis, New York law applies per the terms of the Agreement.

25

transferred.  Volvo brought suit seeking a refund of the tax paid due to the disallowed write-offs, and the jury returned a verdict in Volvo's favor.  The district court entered judgment notwithstanding the verdict as to transfers of inventory made prior to execution of the 1983 contract, finding as a matter of law that the contract did not address inventory previously transferred to the warehouser.  Volvo appealed.  In determining whether the 1983 contract covered inventory previously transferred, we looked to state law "because 'in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property.'"  Id. at 378 (citing United States v. Nat'l Bank of Commerce, 472 U.S. 713, 722 (1985)).  As the Supreme Court stated in National Bank, "[t]his follows from the fact that the federal statute 'creates no property rights but merely attaches consequences, federally defined, to rights created under state law.'"  472 U.S. at 722 (quoting United States v. Bess, 357 U.S. 51, 55 (1958)).

To be sure, the economic substance of the transaction is the primary concern in the instant case.  We need not accept that the parties contracted for the sale of art simply because their signatures appear on a document entitled "Art Purchase Agreement."  Even if we look to state law to help determine the nature of the legal interest conveyed by the Agreement, as

Williams urges us to do, we remain convinced that the Tax Court correctly determined that Williams' charitable contribution deduction is limited to his basis in the donated art.

C.

The Tax Court examined the rights, duties and obligations the parties assumed when they executed the Art Purchase Agreement and concluded that by signing the Agreement and paying $3,600 up front, Williams purchased an option to buy art. Under New York law, "whether an agreement is a binding contract or an option is to be determined like any other issue of contract interpretation from all four corners of the agreement." Interactive Prop. Corp. v. Blue Cross & Blue Shield, 450 N.Y.S.2d 1001, 1002 (1982). Although a "contract for sale" can encompass both a present sale of goods and a contract to sell goods at a future time, a "sale" requires the passing of title from the seller to the buyer for a price, N.Y. U.C.C. Law § 2-106, and "[t]itle to goods cannot pass under a contract for sale prior to their identification to the contract," id. at § 2-401(1). Indeed, "title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods . . . even though a document of title is to be delivered at a different time or place. . . ." Id. at § 2-401(2).

27

An option contract, on the other hand, "is an agreement to hold an offer open; it confers upon the optionee, for consideration paid, the right to purchase at a later date." Kaplan v. Lippman, 75 N.Y.2d 320, 324 (1990). "[U]ntil the optionee gives notice of his intent to exercise the option, the optionee is free to accept or reject the terms of the option." Id. at 325. The contract ripens into a fully enforceable bilateral contract once the optionee gives notice of his intent to exercise the option in accordance with the agreement. Id.

The following leads us to believe the Tax Court correctly concluded that the Art Purchase Agreement is not a contract for sale that triggered the holding period required for long-term capital gain.[12]

1.

Title to the art did not pass upon execution of the Agreement in 1996, and delivery was not made. In fact, the art in question was not even identified in the Agreement. Rather, "[t]he specific items purchased by the Client [were to] be described in written appraisals" and given to Williams once he received physical possession of the art or donated it to a

---

[12] We note that paragraph 12 of the Agreement provides that it is "the entire agreement between the respective parties hereto and there are no other provisions, obligations, representations, oral or otherwise, of any nature whatsoever."

28

charitable institution. This could not occur, pursuant to the Agreement's terms, until Williams paid the balance of the purchase price. While he asserts art was segregated for him in Abbey Art's warehouse, Williams does not have an inventory of this segregated art, nor did he ever visit the warehouse to view it.

2.

The Agreement provides that $3,600, five percent of the total agreed purchase price of the art ($72,000), was to be paid up front and would be held in escrow pending satisfaction of the Agreement's provisions. The balance of the purchase price was due at the time Williams received physical possession of the art or when it was donated, an act which was to occur in the future but at no specified time.

Aside from the initial $3,600 payment, Williams had no obligation to perform under the contract. Williams was not required to follow through with the purchase, and Abbey Art had no right to require specific performance of the full balance of the purchase price. Its sole remedy for Williams' non-payment was to retain as liquidated damages any monies that Williams had paid towards the purchase of the art and to reclaim ownership over it.

Indeed, Abbey Art bore all of the expense and all of the risk in this transaction. It was responsible for selecting and

29

paying the appraiser, packaging and shipping the art, and completing all the necessary paperwork. Even in storing the art, Abbey Art bore the risk of loss. See N.Y. U.C.C. Law § 2-509. Moreover, if the fair market value of the art fell below what was reflected in the appraisal, reducing the tax benefit to Williams, Abbey Art was required to refund Williams the percentage of his dollars paid for each dollar in reduction of the fair market value.

3.

The Agreement provides that the total purchase price of the art would not exceed 24% of the cumulative appraised fair market value of the art purchased.[13] The purchase price set forth in the agreement is $72,000, which is 24% of $300,000. Thus, the Agreement contemplates $300,000 worth of art would be purchased. Yet the fair market value of the first art donation Williams made ($425,625) far exceeded that amount. Arguably, even if title did pass for $300,000 worth of art upon execution of the Agreement in 1996, it still would not account for the extra $125,000 worth of art donated to Drexel University in 1997, the $250,525 worth of art donated to Florida International

---

[13] It goes without saying that the appreciation guaranteed to Williams by virtue of this Agreement is suspect, to say the least. The Commissioner has not challenged the valuation of the art, however, and that issue is not before us.

30

University in 1999, and the $98,900 worth of art donated to Drexel in 2000.

D.

In sum, the 1996 Art Purchase Agreement was not a contract for sale. Therefore, Williams' holding period for purposes of the long-term gain calculation did not begin until he paid for and acquired a present interest in the art. In each instance, this occurred less than one year from the date of his donation. Williams paid for the December 1997 donation to Drexel University in December 1997. He paid for the December 1999 donation to Florida International University in December 1999. And he paid for the October 2000 donation to Drexel in full in December of that same year. For these reasons, we find the Tax Court did not err in concluding that Williams' charitable contribution deduction is limited to his basis in the art.

V.

Because Williams has not met his burden of proving the Commissioner's notice of deficiency is erroneous, we affirm.

AFFIRMED